797 F.2d 823
 106 Lab.Cas. P 34,904
 UNITED TRANSPORTATION UNION; K.K. Eckart; and R.V.
McIntyre, Brotherhood of Locomotive Engineers,
Plaintiffs-Appellants,
v.
Elizabeth DOLE, Secretary of Transportation, Department of
Transportation; and John H. Riley, Administrator,
Federal Railroad Administration,
Defendants- Appellees,
St. Louis Southwestern Railway Company,
Defendant-in-Intervention, Appellee.
 No. 85-1114.
 United States Court of Appeals,
Tenth Circuit.
 June 27, 1986.
 
 Deborah E. Reiser (Lawrence M. Mann, Alper, Mann & Reiser, with her, on brief), Washington, D.C., for plaintiffs-appellants.
 Gregory A. Lee, of Marshall, Davis, Bennett & Hendrix, Topeka, Kan., Billie Stultz, Trial Atty., Federal R.R. Admin. (John M. Mason, Chief Counsel, Gregory B. McBride, Asst. Chief Counsel, Washington, D.C., Benjamin L. Burgess, Jr., U.S. Atty., and Robert Streepy, Asst. U.S. Atty., Kansas City, Kan., with her, on brief), (Mark L. Bennett, Jr., Topeka, Kan., with him on brief), for defendants-appellees.
 Before BARRETT, LOGAN and ANDERSON, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 This appeal is brought by the United Transportation Union, the Brotherhood of Locomotive Engineers, and several individually named appellants (collectively referred to as UTU). In the trial court, UTU requested the following relief: an emergency order to abate, a writ of mandamus, preliminary and permanent injunctions, and a declaratory judgment for violations of the Hours of Service Act, 45 U.S.C. Sec. 61 et seq., allegedly committed by the Federal Railroad Administration (FRA). After a two-day trial, all relief requested by UTU was denied.
 
 
 2
 Appellees (FRA and the Secretary of the Department of Transportation) are charged with enforcing the railroad safety laws by the Hours of Service Act. 45 U.S.C. Sec. 64b and 49 C.F.R. Sec. 1.49(d) (1985). UTU alleges that the FRA did not fulfill its mandatory enforcement obligations against the St. Louis Southwestern Railway Company (SSW, an appellee here and intervenor below). Specifically, UTU complains that the FRA did not issue orders prohibiting SSW from housing employees in a dormitory located in the Armourdale yard, in Kansas City, Kansas.
 
 
 3
 The Hours of Service Act prohibits housing crews in a dorm if the building is in the immediate vicinity of railroad tracks where hazardous materials are switched. If a building was in existence before July 8, 1976, it is exempt from the location requirement unless construction or reconstruction are performed on the building. "Construction" includes acquisition and use of an existing building. UTU claims, inter alia, that SSW planned to carry out construction on the building and FRA did not enforce the Act's restriction.
 
 
 4
 The Armourdale dormitory was constructed by the Chicago, Rock Island and Pacific Railroad Company in 1966. Some of that company's trackage, the Armourdale dormitory, and surrounding rail yard was purchased by SSW in March, 1980. Those facts were stipulated to in the pretrial order. (R. Vol. I, p. 131). The building is within 300 feet of tracks where hazardous materials are switched. Located 13 feet from the dorm are storage tracks where vermin and rats congregate.
 
 
 5
 In May, 1980, SSW determined that unfavorable economic conditions mandated cessation of use of the dormitory as a sleeping facility. However, the building was maintained as a locker facility from 1980 through 1983. In July, 1983, after economic conditions had improved, the company announced its plans to refurbish the dormitory and resume use of the building as a sleeping facility. Three days after construction work on these improvements had begun, UTU filed an action and work was enjoined.
 
 
 6
 Soon after the remodeling plans were announced, a representative of the Brotherhood of Locomotive Engineers lodged a complaint with the FRA alleging that the dormitory was unsafe, unclean, and unsanitary in violation of 45 U.S.C. Secs. 62(a)(3) and (4). The FRA investigated and found several potential problems but these difficulties were worked out through mutual agreement between the FRA and SSW. The FRA concluded that no present or imminent threat of Act violations existed.
 
 
 7
 With the Hours of Service Act, Congress intended to improve the safety of sleeping accommodations that railroads provided for crews. Impetus for strengthening the safety standards in 1976 came from two accidents in the mid-1970s, where explosions in rail yards involving hazardous substances being switched, claimed the lives of trainmen and injured hundreds of employees and townspeople. As part of these new remedial provisions, railroads were required to maintain sleeping facilities for crews no closer than one-half mile to any area where switching or humping[1] operations were performed. 45 U.S.C. Sec. 62(a)(4) and 49 C.F.R. Sec. 228.101(b) (1985).
 
 
 8
 Congress was aware that many of the lodging facilities already in existence when the legislation became effective in 1976 were within the half-mile zone of exclusion. At congressional subcommittee hearings representatives of the railroads vehemently voiced their opposition to the proposed immediate discontinuation of use of these buildings, citing large investments "down the drain." They felt that it was an area more appropriate for collective bargaining and had no provable safety benefit. Federal Railroad Safety Authorization Act of 1976: Hearings on H.R. 11804 and H.R. 11837 before the Subcomm. on Transportation and Commerce of the House Comm. on Interstate and Foreign Commerce, 94th Cong., 2nd Sess. 106 122-23, 190 (1976) (statements of Harold Hall, Vice President, Transportation, Southern Railway Company, Thomas Phemister, Association of American Railroads, and John German, Vice President, Engineering, Mo-Pac Railroad Company, Texas-Pac Railway Co., Chicago-E. Ill. Railroad Co., Mo-Ill Railroad Co., and all subsidiaries).
 
 
 9
 Congress added a "grandfather" clause to the Act, allowing buildings which had been used as sleeping quarters prior to July 8, 1976, which were within the immediate vicinity of switching or humping operations to be exempt from the "half-mile rule" as long as no construction or reconstruction were performed on these facilities. 45 U.S.C. Sec. 62(a)(4).
 
 
 10
 The grandfather clause presumably was inserted to prevent large scale inequity to those railroads which made sizeable financial outlays to erect their lodgings before the legislation was enacted. The grandfather clause protected the investments of those railroads which built the accommodations. However, it did not protect those, like SSW, that, after July, 1976, purchased facilities built by another railroad.
 
 
 11
 The amendment to the Hours of Service Act which we are concerned with here became effective in July, 1976. The amendment provides that "it shall be unlawful for any common carrier, its officers or agents, subject to this chapter, to begin construction or reconstruction of any sleeping quarters ... on or after July 8, 1976, within or in the immediate vicinity (as determined in accordance with rules prescribed by the Secretary) of any area where railroad switching or humping operations are performed." 45 U.S.C. Sec. 62(a)(4). The regulations defining construction and reconstruction were promulgated July 19, 1978, after an ample comment period. SSW is subject to the regulations because the transaction involving the dorm did not occur until March, 1980.
 
 
 12
 The implementing regulations and the statute are intended to be coextensive. After an extended public comment period, the administrator of the FRA issued final rules which provided:
 
 
 13
 (c) As used in this subpart--
 
 
 14
 (1) "Construction" shall refer to the--
 
 
 15
 (i) Creation of a new facility;
 
 
 16
 (ii) Expansion of an existing facility;
 
 
 17
 (iii) Placement of a mobile or modular facility; or
 
 
 18
 (iv) Acquisition and use of an existing building.
 
 
 19
 (2) "Reconstruction" shall refer to the--
 
 
 20
 (i) Replacement of an existing facility with a new facility on the same site; or
 
 
 21
 (ii) Rehabilitation or improvement of an existing facility (normal periodic maintenance excepted) involving the expenditure of an amount representing more than 50 percent of the cost of replacing such facility on the same site at the time the work of rehabilitation or improvement began, the replacement cost to be estimated on the basis of contemporary construction methods and materials. [This rule is far more restrictive than it may appear for the cost of all improvements are to be aggregated.]
 
 
 22
 49 C.F.R. Sec. 228.101(c) (1985) (emphasis added).
 
 
 23
 FRA's interpretation of its own regulation is challenged by UTU. FRA contends that the regulation which provides that "construction refers to acquisition and use of an existing building" means that buildings which were sold from one railroad to another, as is the case here, were not intended to be covered by the regulation. The trial court granted FRA's motion for summary judgment on this ground, finding that, "They (the rulemakers) were not concerned with grandfathered facilities changing ownership from one railroad to another." (R., Vol. II, p. 198). The trial court did not discuss why the language of the regulation, which is plain on its face, was not dispositive. The trial court found in its conclusions of law that, "SSW's plan for rehabilitation of the dormitory facility does not meet the definition of construction or reconstruction as defined by 49 C.F.R. Sec. 228.101(c)(1) [or] (2)." (R., Vol. III, p. 387, n. 5). No explanation of why the definition of construction was not met was included in the conclusions of law.
 
 
 24
 UTU raises several issues on appeal. However, because we believe one to be dispositive we will address only that issue. The issue can be simply phrased: "Was the trial court's conclusion that SSW's proposed rehabilitation was not construction within the meaning of 49 C.F.R. Sec. 228.101(c)(1)(iv) erroneous?"
 
 I.
 
 25
 Before reaching the merits of the issue, we must determine if UTU has abandoned or waived the issue because of the manner in which it was developed in the briefs. UTU first discussed the issue in its motion in opposition to summary judgment. These same arguments were incorporated into UTU's trial brief. UTU listed the issue in its appellate docketing statement and a formulation of the question appeared in UTU's statement of the issues in its appellate brief. In the body of UTU's brief, though, all argument concerning this matter is of a most general nature and cursory. FRA, however, does address the issue in its answer brief. The point was not developed by either party at oral argument.
 
 
 26
 Fed.R.App.P. 28(a)(2) and (4) requires that an appellate brief contain a statement of the issues presented for review and "The argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." The rule is twofold in that the issue must be listed and must be discussed. This court, however, has considered an issue even though it was in a docketing statement but not discussed in the brief because the court believed that it was important enough to merit consideration. Platis v. United States, 409 F.2d 1009, 1012 (10th Cir.1969); compare, Bledsoe v. Garcia, 742 F.2d 1237, 1244 (10th Cir.1984) (where the issue was listed in the docketing statement but was not argued in the brief and was deemed waived.) Here UTU went further than the party in Platis for it preserved the issue for appeal by raising it in the trial court, listing the issue in the docketing statement and in its statement of the issues, and by superficial arguments in its briefs.
 
 
 27
 In this case, the issue is important. It deals with a question of first impression concerning statutory interpretation. The nature of the adversarial system is such that although the court is not precluded from conducting an independent evaluation of the issues, the parties are obligated to persuade the court of the accuracy of their respective positions. Here we have the benefit of FRA's arguments which appear in a summary, though organized, manner in its appellate brief. We also have UTU's sketchy arguments which do not illustrate their contentions as well as they should. However, the issue was thoroughly discussed in the summary judgment motions of each party in the trial court, and these motions are part of the appellate record. The question of waiver is a close one. Even though UTU should have developed the issue in a more thorough and in-depth fashion in its appellate brief, we hold that UTU did not abandon the issue for our review.
 
 
 28
 The reasons for barring our consideration of the matter are not compelling. The issue concerns questions of statutory interpretation urged by the agency and accepted by the district court. Questions of law are entitled to a de novo review; development of a record before the agency or by the agency is not pressing. See Railroad Yardmasters of America v. Harris, 721 F.2d, 1332, 1338-39 (D.C.Cir.1983). In any event, the issue was thoroughly argued in the trial court. Thus, we have the benefit of each party's position there. We believe that it is necessary to correct misconceptions of statutory meaning at the earliest opportunity for the benefit of all who must operate under a statute's purview.
 
 II.
 
 29
 The regulation in question, 49 C.F.R. Sec. 228.101(c), provides that construction refers to acquisition and use of an existing building and that construction on such a building is prohibited. FRA maintains that this regulation does not include existing buildings which are the subject of railroad to railroad transfers. UTU, however, urges that all acquisitions are subject to the prohibition on construction. The interpretation of the regulation that FRA now urges is in substantial variance with the construction the agency offered when the regulation was originally promulgated.
 
 
 30
 Initially, the FRA recognized that acquisitions from any source were subject to the regulation. "In addition, the acquisition of an existing structure for use as sleeping quarters is listed as an event clearly within the purview of the statute and these regulations." (43 Fed.Reg. 31008 (July 19, 1978).) FRA advocated a very broad interpretation of the regulation in its contemporaneous construction:
 
 
 31
 Concern was expressed by one commenter whether these rules would apply only to sleeping quarters constructed or reconstructed by a railroad or its agent and owned by the railroad, and not to sleeping quarters owned by others and rented by the railroad. Again, FRA does not believe that the legal or equitable ownership or newly constructed sleeping quarters is relevant to railroad employee safety. The act makes it unlawful for a carrier "to begin construction or reconstruction" of sleeping quarters which are to be provided for covered employees. It makes no difference that the carrier may act through as intermediary or that the quarters may be constructed on the property of others, so long as the carrier is acting to provide sleeping quarters. These rules are coextensive with the statute with respect to their coverage.
 
 
 32
 Id. FRA also commented that it recognized that Congress' approach was to have stricter standards apply to new or reconstructed facilities. (41 Fed.Reg. 53028 (Dec. 3, 1976)--announcement of interim rules.)
 
 
 33
 The trial court indicated that FRA intended that the regulation apply only to a railroad's acquisition of hotels or places of accommodation. (R., Vol. II, p. 198.) FRA's administrative history of the regulation, however, does not support this.
 
 
 34
 However, the regulation of places of public accommodation such as commercial hotels and motels is beyond the scope of FRA authority under the Hours of Service Act. It is clear from the language of the act read in light of the legislative history that quarters provided in places of public accommodation under an ordinary arms-length transaction are not governed by section 2(a)(3) and (4). See H.R.Rep. No. 1166, 94th Cong., 2d Sess. 11 (1976). Of course, if a railroad acquired ownership or control of a commercial hotel or motel for the purpose of housing employees, the fact that the facility or some portion thereof was open to the public would not avoid the applicability of the Hours of Service Act and the prohibition of section 2(a)(4). In such a case, the emloyer-employee [sic] relationship would clearly be more relevant than the innkeeper-guest relationship when viewed in the light of the statute.
 
 
 35
 (43 Fed.Reg. 31008 (1978).)
 
 
 36
 An agency's construction of its own regulation is entitled to substantial deference. Ford Motor Credit Co. v. Milhollin, 444 U.S. 555-56, 100 S.Ct. 790, 792, 63 L.Ed.2d 22 (1980). This deference is especially appropriate if agency expertise or technical knowledge is involved, id. or if the agency's construction is contemporaneous with the regulation's promulgation. Emery Mining Corp. v. Secretary of Labor, 744 F.2d 1411, 1415 (10th Cir.1984).
 
 
 37
 "When the issue before us is a question of law, the standard of review on appeal is the same as that which would be applied by the trial court in making its initial ruling." Boise City Farmers Cooperative v. Palmer, 780 F.2d 860, 866 (10th Cir.1985). In reviewing questions of law, we must be mindful of the great deference due an agency's interpretation of its own regulations; however, blind adherence cannot result.
 
 
 38
 Interpretation of this particular regulation requires no specialized knowledge within the realm of the Federal Railroad Administration. The presumption of correctness given an agency's construction of its own regulation is not applicable in this case. The regulation took effect in July, 1978, and FRA's present arguments were put forth for the first time in its brief in this case. The record is devoid of any evidence indicating that the FRA has ever interpreted this regulation in the manner that it has in this case. Interpretations published by the FRA at the time the regulation was promulgated are entitled to greater weight than the interpretations the agency now espouses. Emery, supra. The interpretation now urged by the agency is inconsistent with the version set forth when the regulation was promulgated. Although an agency is not required to adhere to an outmoded policy, if a change is made it must be substantiated. If this is a departure from past agency policy due to changed considerations none of the deliberations that the agency relied upon are included or referred to. Thus, we do not view this as a policy change. Rather, it is more properly styled as an argument advanced for this case.
 
 
 39
 More importantly, the agency's present interpretation of the regulation must fail because it conflicts with the statute it purports to implement. Emery, supra, at 1416. "[T]he courts are the final authorities on issues of statutory construction [and] are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." SEC v. Sloan, 436 U.S. 103, 118, 98 S.Ct. 1702, 1712, 56 L.Ed.2d 148 (1977) (citations omitted).
 
 
 40
 The statute prohibits construction of any sleeping quarters (defined by FRA to include acquisition and use of an existing building) by any carrier after 1976. Congress did not provide a specific exemption for railroad to railroad acquisition. It selected the word "any". We will ascribe to that word its plain meaning. This is especially fitting in light of the legislative history of the Act and its broad administrative interpretation as previously supplied by FRA. We will not presume restrictions where Congress provided otherwise. Use of "any" would otherwise be nugatory.
 
 
 41
 The administrative interpretations advanced at the time the rule was promulgated also lend credence to the all-inclusive interpretation of the regulation even though the language of the regulation and the statute are so clear on their faces that consulting administrative history should not have been necessary.
 
 
 42
 The agency's interpretation is inconsistent with congressional intent, the plain language of the regulation, and its own prior administrative interpretations. The court is not forced to ignore the manifest weight of evidence supporting a contrary construction for the agency's preferred interpretation "is only one input in the interpretational equation." Zuber v. Allen, 396 U.S. 168, 192, 90 S.Ct. 314, 327-28, 24 L.Ed.2d 345 (1969), cert. denied, Allen v. Hardin, 396 U.S. 1013, 90 S.Ct. 543, 24 L.Ed.2d 504 (1970).
 
 
 43
 We hold, therefore, that SSW's proposed reopening of the sleeping facility amounts to "construction" under 49 C.F.R. Sec. 228.101(c)(1)(iv) because it is to be performed on a building that is located within the one-half mile zone, which was acquired after July 19, 1978 (the effective date of the regulation) and which was in existence before July 8, 1976 (the date the statute became effective). Consequently, SSW must comply with the regulatory scheme. The scheme provides exceptions to the general ban on "construction" in several limited situations. If SSW wishes to proceed with its construction plans it must first petition the FRA, supplying the information required by the regulations set out below, and attempt to bring itself within one of the exceptions.
 
 
 44
 Accordingly, Rule 1 establishes that all sites within one-half mile (2,640 feet) (804 meters) will be presumed to be in the "immediate vicinity", except as determined otherwise through a site-by-site review. Rule 2 prescribes an approval procedure for construction within the range of one-third to one-half mile (1,760 to 2,640 feet) (536 to 804 meters) from any area where switching or humping operations are performed. Rule 3 prescribes very rigorous criteria and procedures for approval of sites within one-third mile (1,760 feet) (536 meters).
 
 
 45
 * * *
 
 
 46
 * * *
 
 
 47
 For any proposed project sites within one-half mile of switching or humping operations but outside of one-third mile of such operations, FRA will review the sites to determine the relative safety of and noise levels in crew quarters located at the proposed sites based on the topography of the general area of the site and the rail facilities near the site, the location of other physical improvements situated between the site and areas of rail operations, the distance from trackage where specific types of switching or humping operations are performed, and the type of rail operations within the area including the volume of placarded cars transporting hazardous material. If these factors or other information available to FRA indicates that a proposed site would be safe and would be free from railroad-caused noise, the site will be approved.
 
 
 48
 * * *
 
 
 49
 * * *
 
 
 50
 It has come to the attention of FRA that, in extraordinary situations, it may not be feasible to construct carrier-provided sleeping quarters at or beyond one-third of a mile. Therefore, FRA will consider the approval of locations within that range where the carrier makes an affirmative showing of its inability to obtain an alternate site suitable for the purpose and demonstrates that the location and type of construction are so unique as to justify approval on the grounds of safety and freedom from railroad-caused noise. The cost to the railroad of providing an alternate site will not be considered in evaluating whether a "feasible" alternate site is, in fact, available.
 
 
 51
 * * *
 
 
 52
 * * *
 
 
 53
 Under Rule 3, the carrier would have to establish that an alternate site cannot be obtained and that the physical characteristics of the location and the proposed method of construction provide extraordinary protection against noise and hazardous materials incidents. Distances would be measured from the nearest rail of trackage utilized for switching or humping to the portion of the site on which would be located the exterior wall of the quarters which is the closest to the areas in which switching or humping are performed.
 
 
 54
 41 Fed.Reg. 53029 (1976) (codified at 49 C.F.R. Secs. 228.103 and 228.105 (1985)).
 
 
 55
 We must reverse the order of the district court and direct that the matter be remanded to the agency for further proceedings consistent with this opinion.
 
 
 56
 REVERSED with directions to REMAND.
 
 LOGAN, Circuit Judge, concurring:
 
 57
 I agree with Judge Barrett that we can consider whether the acquisition of the sleeping quarters at issue in this case by the St. Louis Southwestern Railway Company (SSW) was equivalent to the "construction" prohibited by the Hours of Service Act as amended, see 45 U.S.C. Sec. 62(a)(4). I also agree with the result reached in his opinion. I write separately because my reasoning differs somewhat from his.
 
 
 58
 We stretch somewhat when we say that the issue whether "acquisition" is equivalent to "construction" was properly preserved and argued on appeal. The issue was argued to the district court. It was set out clearly in the docketing statement, but we have stated that raising an issue in a docketing statement without subsequently arguing it in the briefs results in waiver. Bledsoe v. Garcia, 742 F.2d 1237, 1244 (10th Cir.1984); Whitehead v. Salyer, 346 F.2d 207, 209 n. 2 (10th Cir.1965). The issue was not argued orally in our court and is presented in the briefs only through a most generous reading. But we have made exceptions to the rule of waiver when the issue involved is of substantial public interest. See Platis v. United States, 409 F.2d 1009, 1012 (10th Cir.1969); see also Consumers Union of United States, Inc. v. Federal Power Commission, 510 F.2d 656, 662 & nn. 9, 10 (D.C.Cir.1974) (citing Platis for exception due to substantial public interest). The argument was pursued better here than in Platis, and I agree with Judge Barrett that a substantial public interest is at stake in this issue of first impression.
 
 
 59
 In addition, although the district court found for the agency on its motion for summary judgment, we are not prevented from deciding the issue in favor of the union without remanding for trial. The parties stipulated to the only legally significant fact, i.e., the acquisition. The question whether that acquisition amounts to "construction" under the statute is one of law, which we can dispose of on appeal.
 
 
 60
 Although Judge Barrett's opinion asks whether SSW's "rehabilitation" of the sleeping quarters was equivalent to construction, and refers to a "proposed reopening" of the sleeping quarters, his discussion makes clear that the truly dispositive question is whether SSW's acquisition of the quarters--not the construction work on the building or its reopening for sleeping--was equivalent to construction. If SSW's acquisition of the property in March 1980 was unprotected by the statute's grandfather clause, SSW's use of the property as a sleeping quarters from that point until May 1980 violated the statute and regulation.
 
 
 61
 With the issue so clarified, I agree that the reference in 49 C.F.R. Sec. 228.101(c)(1)(iv) to "[a]cquisition and use of an existing building" should not be read to cover grandfathered facilities acquired by purchase from another railroad. To hold otherwise is inconsistent with the plain language of the regulation and the evidence we have of the congressional intention behind the statutory amendments.
 
 
 62
 I answer the Federal Railroad Administration's (FRA) argument that we defer to its current interpretation by observing that there is nothing in the record to suggest that the agency had taken the position it now advocates before this litigation arose. Significantly, the agency said in its memorandum supporting its summary judgment motion that it had never interpreted "existing buildings" in Sec. 228.101(c)(1)(iv) to mean grandfathered sleeping quarters; yet it fails to cite any prior agency statements or actions that take a contrary position. R. I, 89. And it admits that on its face "existing buildings" appears to refer to "any building in existence at the time of the acquisition." Id. (emphasis added). We have deferred often and properly to agency interpretations of statutes or regulations. But this does not include simple acquiescence to their litigating positions. Rather judicial deference generally is reserved for agency views that have been reflected in formal pronouncements or have been known through other means for a long time. In Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), for example, the agency interpretation at issue "had, long prior to respondents' applications, been a matter of public record and discussion." Id. at 17, 85 S.Ct. at 802. And in Hoover & Bracken Energies v. United States Department of Interior, 723 F.2d 1488 (10th Cir.1983), we upheld an agency interpretation consistent with its own ruling in a similar case ten years earlier. Id. at 1491-92.
 
 
 63
 Our responsibility goes beyond mere rubber stamping of ad hoc agency decision making or after-the-fact rationalizations. Although judges should refrain from "substituting their own interstitial lawmaking" for that of an agency so long as the agency's position is not irrational, we cannot abdicate our "ultimate judicial responsibility to determine the law." See Ford Motor Co. v. Milhollin, 444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980).
 
 
 64
 The agency made no contemporaneous statements on whether acquisition of grandfathered facilities from another railroad would be permissible. The proposed and interim regulations did not contain the acquisition language. Rather they referred only to creation of a new facility or expansion of an existing facility. Construction of Railroad Employee Sleeping Quarters; Interim Rules, 41 Fed.Reg. 53,028, 53,030 (1976); Proposed Amendment to Hours of Service Regulations, 41 Fed.Reg. 53,070, 53,073 (1976). The final regulations, however, contained the acquisition language and some relevant commentary. In its discussion of the final rule, the FRA stated that the "acquisition of an existing structure for use as sleeping quarters is listed as an event clearly within the purview of the statute and these regulations." Construction of Railroad Employee Sleeping Quarters; Final Rules, 43 Fed.Reg. 31,006, 31,008 (1978) (emphasis added). It gave the acquisition of a commercial hotel or motel for the purpose of housing employees as an example of acquisition equivalent to "construction" under the statute and said it also would not permit railroads to rent such quarters owned by others, because the railroad's ownership was not relevant to employee safety. Id.
 
 
 65
 None of the cited statements explicitly rules in or out a situation like the one before us, but in my view they are more supportive of Judge Barrett's interpretation than Judge Anderson's. The plain meaning of the regulation is nonrestrictive. I cannot accept Judge Anderson's conclusion that the agency's use of hotel acquisition as an example in its explanation of Sec. 228.101(c)(1)(iv) meant that it intended to limit the regulation's application to that context. Nor does the distinction make safety sense. As the agency reasoned in its discussion of temporary structures, potential hazards to employees housed in acquired dormitories are no less serious than those imposed on employees housed in acquired hotels. See 43 Fed.Reg. at 31,008.
 
 
 66
 The bottom line to me is the congressional concern for safety. The legislative history of the statutory amendments demonstrates that Congress' main motive was safety, not economics. Committee reports from both houses reflect congressional frustration with the FRA's earlier inaction on safety matters. See S.Rep. No. 855, 94th Cong., 2d Sess. 2-3, reprinted in 1976 U.S.Code Cong. & Ad.News 1534, 1535-36; H.R.Rep. No. 1166, 94th Cong., 2d Sess. 11. The railroads were alarmed at the potential cost--the loss of their existing investment in sleeping facilities. Congress apparently added the grandfather clause as an afterthought, to soften but not eliminate the blow of the stricter statutory requirements.[1] The afterthought should not be allowed to defeat the aim of the legislation as a whole. I read Congress' broader intention to mean that a railroad should make no significant additional investment in sleeping quarters near hazardous railroad switching or humping operations after July 1976. Judge Anderson's dissent raises some interesting problems concerning applying the regulation to mergers, reorganizations, and the like. The case before us, however, presents not a post-Act reorganization or merger of two railroads, but rather an outright purchase of less than all of the assets of a failed railroad. I do not see why that acquisition should be treated differently from the purchase of a hotel, which is prohibited. SSW was not committed to this investment before the legislation passed Congress. I do not think Congress intended the benefit SSW seeks here. Neither the wording of the statute nor the wording of the regulation requires such a result.
 
 
 67
 Therefore I concur with Judge Barrett's reversal and remand.
 
 ANDERSON, Circuit Judge, dissenting:
 
 68
 The majority opinion[1] reaches its result by rejecting the agency's interpretation of its own regulation; and adopting a definition directly inconsistent with the statute and plain intention of congress. In so doing the majority destroys the use of a railroad capital asset expressly protected by congress, and establishes precedent which could cost the railroad industry millions of dollars.
 
 
 69
 The sleeping quarters building involved in this case was a wholly incidental part of a major railroad acquisition. On March 24, 1980, the St. Louis Southwestern Railway Company ("SSW") purchased from the Chicago, Rock Island and Pacific Railroad ("Rock Island") the approximately 850 mile route from Tucumcari, New Mexico to St. Louis, Missouri. Included within that acquisition were the switching yards within which the sleeping quarters were situated. The building had been continuously in use as crew sleeping quarters for more than thirteen years. Some months following the change in overall ownership economy moves resulted in different sleeping accommodations at the site in question. However, only the ownernship transition date is relevant to the majority opinion.
 
 
 70
 The pertinent statute makes it unlawful "to begin construction " of certain railroad facilities after July 8, 1976 (the date of enactment). 45 U.S.C. Sec. 62(a)(4) (emphasis added). The question is whether the "acquisition" of an existing, protected, pre-1976 facility as a minor and incidental part of a major railroad asset purchase, means that the acquiring railroad has begun construction of that facility. Plain English makes a negative answer mandatory. Statutory history confirms that conclusion.
 
 
 71
 The statute controls our inquiry just as it also controls the permissible scope of regulations issued in respect of the statute. Our analysis, therefore, proceeds in that order.
 
 
 72
 A. The Statute.
 
 
 73
 In 1976 Congress enacted legislation regulating sleeping quarters provided for railroad employees. One provision prohibited any sleeping quarters within a prescribed area "where railroad switching or humping operations are performed."[2] At House Subcommittee hearings on the proposed bill, representatives of the railroad industry objected to the bill's application to existing facilities. Federal Railroad Safety Authorization Act of 1976: Hearings on H.R. 11804 and H.R. 11837 Before the Subcomm. on Transportation and Commerce of the House Comm. on Interstate and Foreign Commerce, 94th Cong., 2d Sess. (Feb. 24-26, 1976) (Serial No. 94-61) ("Hearings"). The Missouri Pacific Railroad speaking on behalf of the Association of American Railroads ("AAR") said that "[t]o propose legislation rendering [such existing facilities] unusable would be grossly unwarranted." Id. at 190 (statement of John G. German, Vice President-Engineering, Missouri-Pacific System). According to an AAR impact survey, the sample railroads (accounting for 67.5 percent of all Class I railroad employment) maintained or used 289 facilities within one mile of switching or humping activities. Id. at 122 (statement of Thomas A. Phemister, Assistant General Solicitor, Association of American Railroads). Extrapolating from that data, the AAR concluded that the industry would incur a one-time cost for the move of $20 million and an additional annual cost of $33 million for such expenditures as transportation and more costly facilities. Id. at 122-123. Southern Railway Company reported that its own "existing investment of $1,757,600 in dormitories would be a dead loss." Id. at 109 (statement of Harold H. Hall, Vice President-Transportation, Southern Railway Co.).
 
 
 74
 After further scrutiny by the House Committee, the original sleeping quarters provision of the bill was substantially revised and its scope narrowed; the provision reported out of the House Committee was the version ultimately enacted. The revised bill provided:
 
 
 75
 It shall be unlawful for any common carrier, its officers or agents, subject to this Act--
 
 
 76
 * * *
 
 
 77
 * * *
 
 
 78
 (4) to begin construction or reconstruction of any sleeping quarters referred to in paragraph (3), on or after the date of enactment of this paragraph, within or in the immediate vicinity (as determined in accordance with rules prescribed by the Secretary) of any area where railroad switching or humping operations are performed.
 
 
 79
 45 U.S.C. Sec. 62(a)(4) (Emphasis added).
 
 
 80
 In its explanation of the bill the House Committee Report states that all sleeping quarters, both existing and future, must meet the "clean, safe, and sanitary" standard and provide an opportunity for undisturbed rest, but that the location restriction applied only to "new construction or reconstruction of old sleeping quarters." H.R.Rep. No. 1166, 94th Cong., 2d Sess. 5 (1976) ("House Report") (emphasis added). The House Report explicitly confirms that only new construction or reconstruction, not use, of existing facilities is forbidden.
 
 
 81
 Nothing in the statute and nothing in the legislative history even remotely suggests that existing facilities would lose their statutory exemption and suddenly become "new construction" if the ownership of a railroad passed from one railroad to another. In July 1976, when the new construction prohibition was adopted, Congress was acutely aware of the economic vicissitudes of the railroad industry and of the likelihood of future mergers, bankruptcies, and reorganizations of existing railroad companies. Only four months had passed since Conrail was formed from five northeastern railroads. In such an economic climate, a nontransferrable exemption would have been so short-lived as to be almost worthless. Yet Congress described the location restriction as applying only to "new construction or reconstruction of old sleeping quarters," without the caveat that transfer of ownership of the facility would trigger the prohibition. House Report at 5.[3]
 
 
 82
 Extended discussion is unnecessary. Legislative history clearly establishes congressional intent to prevent the abrupt loss of the railroad capital assets in question, through an artificial external event such as legislation, or changes in the ownership of railroads. That intent could not have been more plainly expressed in the statute. Neither dictionary definition nor common usage of the term "construction" equates that word with "acquisition." When the statutory qualifying words "to begin" are added to "construction" it would simply defy the English language to equate that entire phrase with the word "acquisition." When the ownership of a railroad changes hands the execution of the documents of transfer in a corporate board room clearly does not translate into the commencement of construction of existing sleeping facilities, many years old, in place, on site, and unchanged.
 
 
 83
 B. The Regulation.
 
 
 84
 The regulation upon which the majority opinion focuses provides:
 
 
 85
 (c) As used in this subpart--
 
 
 86
 (1) "Construction" shall refer to the--
 
 
 87
 (i) Creation of a new facility;
 
 
 88
 (ii) Expansion of an existing facility;
 
 
 89
 (iii) Placement of a mobile or modular facility; or
 
 
 90
 (iv) Acquisition and use of an existing building.
 
 
 91
 49 C.F.R. Sec. 228.101(c)(iv). It is instantly apparent that the purpose of those regulations was two-fold: subsections (i) and (ii) mirrored the words "construction" and "reconstruction" in the statute; subsections (iii) and (iv) were designed to prevent circumvention of the statute by some artful device.
 
 
 92
 In defining the "acquisition and use of an existing building" as a form of "construction" for purposes of section 62(a)(4), the rulemakers were explicitly concerned with situations in which the railroad rented or purchased, directly or through an agent, "an existing structure for use as sleeping quarters." 43 Fed.Reg. 31,008 (1978). The preamble to the final rules cites the examples of a railroad (i) acquiring ownership or control of a commercial hotel or motel for the purpose of housing employees or (ii) renting an existing building that is not a place of public accommodation. Id. The rulemakers do not explicitly address the issue of whether railroads are prohibited from acquiring or using existing, "grandfathered" sleeping quarters owned by other railroads. The majority does not so contend. Rather, it argues that the FRA was expansive in its characterization of the regulation. However, expansive but ambiguous is quite different from expansive and specific. If there is any ambiguity in this case, we are compelled to defer to the agency's interpretation of the regulation rather than tell the agency what we think they meant by their own language.
 
 
 93
 In reviewing the construction of a statute or regulation, courts must accord "great deference" to the interpretation given a statute or regulation by the agency charged with its administration. Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801-02, 13 L.Ed.2d 616 (1965); Hoover & Bracken Energies, Inc. v. United States Department of Interior, 723 F.2d 1488, 1489 (10th Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984); Grynberg v. Watt, 717 F.2d 1316, 1318 (10th Cir.1983), cert denied, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553 (1984). Moreover, when an agency interprets its own regulation, the level of deference is heightened even more. Id. In Udall the Supreme Court stated:
 
 
 94
 When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.
 
 
 95
 "Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.... [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."
 
 
 96
 Bowles v. Seminole Rock Co., 325 U.S. 410, 413-14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, Udall, 380 U.S. at 16-17, 85 S.Ct. at 801-02. (Emphasis Added). The "plainly erroneous or inconsistent" standard of review applies to an administrative agency's interpretation of its own regulation, Udall, 380 U.S. at 17; Hoover & Bracken Energies, 723 F.2d at 1489, and the agency's construction of the regulation need only be a reasonable one, Udall, 380 U.S. at 16, 85 S.Ct. at 801.
 
 
 97
 Is the regulation clear and specific as to the meaning and application of "acquisition"? Is it beyond the need for interpretation? It must not be; otherwise, it would give us the answer to the following various permutations of the majority's interpretation of "acquisition." Does acquisition extend to changes in ownership through corporate stock purchases? Mergers? Railroad reorganizations? Railroad joint ventures in which a separate entity is created and assets transferred for joint venture purposes? Acquisition of a fractional undivided ownership interest in railroad assets (and, if so, what percentage of new ownership must be reached, one-percent? fifty-percent? eighty-percent?)? Examples could be multiplied but the foregoing illustrate the point, which is that the regulation is not as specific as the majority views it. Interpretation is required. In this case we have the agency's interpretation, and that interpretation is not plainly inconsistent with an ambiguous, general regulation. Therefore, we are required to defer to the agency. It is utterly anomalous to say in this case that the agency had almost plenary power to interpret the statute by regulation, but has virtually no power to interpret the regulation upon which the majority relies.
 
 
 98
 Finally, even if by some stretch of the imagination the interpretation of the regulation employed by the majority is supportable, then the regulation is invalid. A regulation thus interpreted would be so inconsistent with the plain meaning of the statute, as pointed out previously, that it could not be enforced.
 
 
 99
 Because of the narrow ground upon which the issues have been framed by the majority opinion, it is inappropriate to examine and comment upon the issues in this case which were briefed and argued by the parties on appeal. Therefore, it is impossible in this dissent to state my views as to whether or not the judgment of the district court should be affirmed, reversed, or whether some other action should be taken. I state only that it is improper to reverse on the ground stated in the majority opinion.
 
 
 
 [1]
 "Humping" is a term of art denoting a method by which railroad cars are switched. (43 Fed.Reg. 31009 (July 19, 1978).)
 
 
 [1]
 The FRA recognized this priority order in its comments to the interim rules. See 41 Fed.Reg. at 53,028 ("primary impetus" for statutory amendments was a rail yard accident)
 
 
 [1]
 For convenience, references to the majority opinion include the concurring opinion, since the points in this dissent relate equally to both
 
 
 [2]
 As introduced, the sleeping quarters' provision of the bill (section 4 of H.R. 11804 and section 4 of S. 3119) would have made it unlawful, under section 2(a) of the Hours of Service Act:
 (3) not to provide employees with sleeping quarters, including crew quarters, camp or bunk cars, and trailers, which (A) provide employees with an opportunity for uninterrupted rest in quarters having controlled temperatures, and (B) are located away from a yard where switching or humping is performed.
 H.R.Res. 11804, 94th Cong., 2d Sess. Sec. 4 (1976); S.Res. 3119, 94th Cong., 2d Sess. Sec. 4 (1976) (emphasis added).
 
 
 [3]
 Most of the foregoing information was either extracted or quoted from the brief filed in the district court on behalf of the Federal Railroad Association. R.Vol. I, at 89