GORSUCH, Circuit Judge,
dissenting.
Though reluctant to part company with my colleagues, I feel constrained to do so in this case because the majority reverses the district court employing arguments that the appellant never made before that court, never pressed on appeal, and many of which the appellant has expressly disavowed. They are arguments, as well, to which the appellee has never had the chance to respond. Skeptical of my own capacity to arrive purely by judicial self-direction at the optimal understanding of a complex corner of federal communications law, and concerned about proceeding without at least affording the affected litigants notice and an opportunity to be heard on theories pursued by the court, I respectfully dissent.
To begin at the beginning, in Count I of its complaint WWC Holding Company (“Western Wireless”) contested the authority of the Public Utilities Commission of the State of Colorado (“PUC” or “Commission”) to regulate rates under 47 U.S.C. § 332(c)(3) of the Telecommunications Act of 1996 (the “Act” or “1996 Act”). In Count II, Western Wireless challenged the Commission’s authority under 47 U.S.C. § 151 to impose conditions, respecting either rates or non-rate terms of service, on the company’s bundled interstate service offerings. After a careful analysis, the district court enjoined the PUC’s rate-setting foray, explaining that Section 332(c)(3)(A) prohibits states from regulating the entry of or the rates charged by a wireless carrier. Notably, the PUC has not appealed this central determination of the district court. Thus, the first issue remaining for our resolution on appeal concerns that portion of Count II which survived — namely, Western Wireless’s challenge to the Commission’s authority to regulate non-rate terms and conditions of its services.
In a section titled “State Authorities and Interstate Communications,” the majority approaches this question by pursuing the broad thesis that state commissions are free to regulate any non-rate terms and conditions of interstate service provided by mobile service eligible telecommunications carriers (“ETCs”). Maj. Op. at 1270-75. Yet, the Commission itself never — either before the district court or on appeal— advocated such a theory. Indeed, in its briefs and again at oral argument the Commission expressly disclaimed any authority to regulate the terms and conditions of Western Wireless’s interstate services. See, e.g., Reply Br. at 9; ApltApp. at 227. According to the Commission, its order merely seeks to impose conditions on Western Wireless’s intrastate services, and it happens to affect Western Wireless’s interstate offerings only by virtue of Western Wireless’s independent (and presumably lucrative) business decision to bundle intrastate and interstate service offerings.
To be sure, the parties cannot stipulate to a false reading of a statute, and we are not rigidly precluded from deciding a case on an unargued but apparent point of law. See United States v. International Business Machines Corp., 517 U.S. 843, 866-68, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996) (Kennedy, J., dissenting) (collecting authority). But just because we have the power to resolve a question of course does not mean we must, or should, always do so. Indeed, when a party “cho[o]se[s] not to” pursue a legal theory potentially available to it, we generally take the prudential position that it is “inappropriate ... without the benefit of the parties’ briefing” to pursue that theory in our opinions. Id. at 855, 116 S.Ct. 1793 (majority opinion) (internal quotation omitted); see generally Spector Motor Serv., Inc. v. Walsh, 139 *1280 F.2d 809, 823 (2d Cir.1943) (Hand, J., dissenting) (It is not “desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant.”), vacated sub nom., Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944).[1] Our caution flows in part from a recognition of our dependence on the traditions of the adversarial process in testing the issues for our decision and the error we risk when we strike out on our own; it flows, too, from concern for the affected parties to whom we traditionally extend notice and an opportunity to be heard on the issues that affect them. See Zamora v. Elite Logistics, Inc., 478 F.3d 1160, 1183-84 (10th Cir.2007) (en banc) (Gorsuch, J., concurring).[2]
My concern with striking out on a new course the parties have not advocated or been permitted to address, even through supplemental briefing, is heightened by the setting of this particular dispute. This case involves a complex and relatively unstudied corner of the controlling statutory regime.[3] No issue of constitutional gravity or personal liberty is at stake. And the parties were afforded the full benefit of highly competent counsel and thus presumably made deliberate and informed tactical decisions regarding which legal theories to pursue (and not pursue).
Meanwhile, the majority implicitly rejects the PUC’s understanding of its own order without pausing to consider whether the agency is entitled to some degree of deference regarding the meaning of its own decree.[4] The majority’s novel theory also treads into a longstanding national discussion about the proper role of competing federal and state authorities in the regulation of the telecommunications industry,[5] and it appears to come down rather strongly in favor of one competing school of thought.[6] Neither is its analysis about the role of states in the regulation of *1281 interstate telecommunications altogether self-evident or free from question.[7] Perhaps most significantly of all, none of this is really necessary. What remains of Count II can be resolved readily, without any of these difficulties and with faithfulness to the statutory scheme before us, on a basis fully vetted by the parties and district court.[8]
The reasons that give me pause about the court’s disposition of Count II recur with respect to Count IV. Before the district court, Western Wireless argued that, even if the Commission had the authority to oversee the non-rate terms and conditions of its ETC service, Section 254(f) required the Commission to proceed through formal rulemaking processes rather than, as it did here, by imposing informal conditions on Western Wireless’s ETC designation. Aplt.App. at 88-91. The Commission responded by suggesting only that the validity of the conditions it imposed on Western Wireless hinge on whether it engaged in the unlawful rate regulation challenged in Count I. See Aplt. App. at 227-28. At summary judgment, the district court agreed with Western Wireless’s assertion in Count IV that the PUC may only establish quality of service standards through formal regulations adopted pursuant to Section 254(f).
The majority reverses on the basis that Section 254(f) speaks only to state universal service fund subsidy issues and, thus, that nothing in that provision can be a source of, or a limitation on, a state’s authority in imposing “operational and consumer protection requirements” on an ETC designee. Maj. Op. at 1277; see *1282 generally id. at 1276-78. Once again, however, the PUC never pursued such a theory for reversal; the district court never had the chance to pass upon it; and Western Wireless has never had the opportunity to respond to it. In fact, when asked at oral argument whether Section 254(f) applied only to state universal service funds, both parties answered in the negative.
Meanwhile, and once again, the majority’s self-charted course does not obviously flow from our precedent and is not immune to question.[9] At the same time, this case could have been readily resolved on the basis of the parties’ actual arguments while fully preserving the viability of the majority’s theory.[10] Even if in the fullness of time the majority proves to have bettered both parties regarding the scope and meaning of Section 254(f), for reasons already explored I am reluctant to proceed down this path without first at least affording the parties affected by our decision notice and an opportunity to be heard. See supra pp. 1267-68.
I respectfully dissent.

. The majority cites as contrary authority United Transportation Union v. Dole, 797 F.2d 823 (10th Cir.1986). Maj. Op. at 1276 n. 10. But there the court emphasized that, quite unlike here, the legal theory it pursued had been "thoroughly argued in the trial court.” Dole, 797 F.2d at 828.

. These same rationales undergird our general prudential practice of declining to entertain even those arguments actually pursued by a party but only raised for the first time on appeal, as well as those arguments preserved before the district court but raised on appeal only in a reply brief. See Hill v. Kemp, 478 F.3d 1236, 1250-51 (10th Cir.2007); Telecommunications, Inc. v. Comm'r of Internal Revenue, 104 F.3d 1229, 1233 (10th Cir.1997) ("In order to preserve the integrity of the appellate structure, we should not be considered a ‘second-shot’ forum, a forum where secondary, back-up theories may be mounted for the first time.”).

. See Jim Chen, Subsidized Rural Telephony and the Public Interest: A Case Study in Cooperative Federalism and Its Pitfalls, 2 J. Tele-comm. & High Tech. L. 307, 314 (2003) (hereinafter "Chen”) (describing § 214(e) as a "seemingly obscure provision” of the Act).

. See, e.g., Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am., 885 F.2d 683, 688 (10th Cir.1989) (noting the “deference we owe to [an administrative agency's] interpretation of its own orders”).

. See, e.g., Kyle D. Dixon & Philip J. Weiser, A Digital Age Communications Act Paradigm for Federal-State Relations, 4 J. Telecomm. & High Tech. L. 321, 342-43 (2006); Chen at 308-317, 362-69; Peter W. Huber, Michael K. Kellogg & John Thorne, Federal Telecommunications Law §§ 3.3.3-3.9 at 223-270 (2d ed.1999).

. See Chen at 309-13 (describing competing camps of those who have pushed for deregulation of the telecommunications industry and those who have pushed for devolution of regulatory power from the federal government to the states, and labeling proponents of the latter perspective members of the "Colorado school” in recognition of the home of certain perceived advocates of this position).

. By way of example, the court appears to invert the Supreme Court's requirement of an express congressional intention prior to permitting states to regulate interstate commerce. See Maj. Op. 1274-75 (quoting New Yorkv. United States, 505 U.S. 144, 171, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992)). The majority posits that by "expressly allowing the states to regulate the ‘other terms and conditions' ” of mobile services, and by Congress's failure to limit this authority "to instances where only intrastate commerce is affected," Congress has expressed an unambiguous intent to permit states to regulate interstate commerce. Maj. Op. at 1275. But, while Congress may be faithfully characterized as having unambiguously given states authority to regulate "other terms and conditions” of mobile services, this is not at all obviously the same thing as expressly bestowing states with authority to regulate interstate commerce in this endeavor. Indeed, the majority seems to read Congress’s silence regarding the effect of any such state regulation on interstate commerce into an unambiguous expression of intent.

. Congress expressly allowed state commissions to regulate intrastate services, see 47 U.S.C. § 152(b), and, more specifically, to impose "terms and conditions" on intrastate services provided by wireless carriers. 47 U.S.C. § 332(c)(3)(A); see also Fed.-State Joint Bd. on Universal Serv., 20 F.C.C.R. 6371, 6384-85 (2005) ("2005 Universal Service Order")-, accord Tex. Office of Pub. Util. Counsel v. FCC, 183 F.3d 393, 418 (5th Cir.1999). Western Wireless points to nothing in the Act that preconditions this undisputed state authority on a further inquiry into whether an ETC applicant has made an independent business decision to bundle (regulated) intrastate services with (nonregulated) interstate services. To be sure, Congress specified that the FCC may preempt any state regulation that it finds to be so onerous as to erect a barrier to entry, amount to rate regulation, or otherwise interfere with the ability of an entity to provide telecommunications service. See 47 U.S.C. § 253(a), (d); id. § 332(c)(3)(A). But Western Wireless has not begun to assert before us (or, apparently, the FCC) that the conditions specified by Congress for relief apply here. Instead, it asks us to fashion out of whole cloth a new rule absolving carriers from state regulation any time a wireless carrier makes the independent business decision to bundle its services. We are not free to substitute our judgment for Congress's and write into a comprehensive statutory regime a new, lower bar for relief than the Legislature itself chose to enact. More than that we need not say to resolve Count II.

. While the latter two sentences of Section 254(f) do concern universal service subsidies, the first sentence is not obviously so limited, indicating that “[a] State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service.” Moreover, contrary to the majority’s suggestion that the FCC has spoken of Section 254(f) only in the context of a state universal service fund, in at least one decision the Federal-State Joint Board on Universal Service indicated that Section 254(f) may limit a state’s rule-making power in another area, a state commission's designation of the service area for ETC designation. See Fed.-State Joint Bd. on Universal Serv., 12 F.C.C.R. 87, 181 (1996) (Recommended Decision).

. Before the district court, the PUC argued only that Count IV should stand or fall with the court’s resolution of Count I concerning rate regulations. With Count I indisputably having fallen, so in fairness ought Count IV. While perhaps seemingly all too facile or straightforward, resolving the case in this manner would have the virtue of adjudicating the case both modestly and on the basis of the parties' chosen arguments, while leaving the majority’s theory of the statute open and available for litigants wishing to pursue it another day. To be sure, on appeal the PUC sought to raise additional arguments for reversal. But we generally will not consider such late-blossoming arguments, see supra note 2, and the majority today itself does not address them.