# UNITED STATES *v.* INTERNATIONAL BUSINESS MACHINES CORP.

No. 95–591.   Argued March 18, 1996—Decided June 10, 1996

844

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, SOUTER, and BREYER, JJ., joined. KENNEDY, J., filed a dissenting opinion, in which GINSBURG, J., joined, *post*, p. 863. STEVENS, J., took no part in the consideration or decision of the case.

*Jeffrey P. Minear* argued the cause for the United States. On the briefs were *Solicitor General Days, Assistant Attorney General Argrett, Deputy Solicitor General Wallace, Kent L. Jones, Gary R. Allen,* and *Ernest J. Brown.*

*James R. Atwood* argued the cause for respondent. With him on the brief was *Andrew W. Singer.*

JUSTICE THOMAS delivered the opinion of the Court.

We resolve in this case whether the Export Clause of the Constitution permits the imposition of a generally applicable, nondiscriminatory federal tax on goods in export transit. We hold that it does not.

I

Section 4371 of the Internal Revenue Code imposes a tax on insurance premiums paid to foreign insurers that are not subject to the federal income tax.[1]  26 U. S. C. § 4371 (1982 ed.).  International Business Machines Corporation (IBM) ships products that it manufactures in the United States to numerous foreign subsidiaries and insures those shipments against loss.  When the foreign subsidiary makes the shipping arrangements, the subsidiary often places the insurance with a foreign carrier.  When it does, both IBM and the subsidiary are listed as beneficiaries in the policy.

IBM filed federal excise tax returns for the years 1975 through 1984, but reported no liability under § 4371.  The Internal Revenue Service (IRS) audited IBM and determined that the premiums paid to foreign insurers were taxable under § 4371 and that IBM—as a named beneficiary of the insurance policies—was liable for the tax.  The IRS assessed a tax against IBM for each of those years.

IBM paid the assessments and filed refund claims, which the IRS denied.  IBM then commenced suit in the Court of

---

[1] The tax does not apply if a policy issued by a foreign insurer is "signed or countersigned by an officer or agent of the insurer in a State, or in the District of Columbia, within which such insurer is authorized to do business."  26 U. S. C. § 4373(1) (1982 ed.).

Federal Claims, contending that application of § 4371 to policies insuring its export shipments violated the Export Clause. The focus of the suit was this Court's decision in *Thames & Mersey Marine Ins. Co.* v. *United States*, 237 U. S. 19 (1915), in which we held that a federal stamp tax on policies insuring marine risks could not, under the Export Clause, be constitutionally applied to policies covering export shipments. The United States argued that the analysis of *Thames & Mersey* is no longer valid, having been superseded by subsequent decisions interpreting the Import-Export Clause—specifically, *Michelin Tire Corp.* v. *Wages*, 423 U. S. 276 (1976), and *Department of Revenue of Wash.* v. *Association of Wash. Stevedoring Cos.*, 435 U. S. 734 (1978). The Court of Federal Claims noted that this Court has never overruled *Thames & Mersey* and ruled that application of § 4371 to policies insuring goods in export transit violates the Export Clause. 31 Fed. Cl. 500 (1994). The Court of Appeals for the Federal Circuit affirmed. 59 F. 3d 1234 (1995). We agreed to hear this case to decide whether we should overrule *Thames & Mersey*. 516 U. S. 1021 (1995).

## II

The Export Clause states simply and directly: "No Tax or Duty shall be laid on Articles exported from any State." U. S. Const., Art. I, § 9, cl. 5. We have had few occasions to interpret the language of the Export Clause, but our cases have broadly exempted from federal taxation not only export goods, but also services and activities closely related to the export process. At the same time, we have attempted to limit the term "Articles exported" to permit federal taxation of pre-export goods and services.

Our early cases upheld federal assessments on the manufacture of particular products ultimately intended for export by finding that pre-export products are not "Articles exported." See *Pace* v. *Burgess*, 92 U. S. 372 (1876); *Turpin* v. *Burgess*, 117 U. S. 504 (1886); *Cornell* v. *Coyne*, 192 U. S. 418

(1904). *Pace* and *Turpin* both involved a federal excise tax on tobacco products. In *Pace*, though tobacco intended for export was exempted from the tax, the exemption itself was subject to a per-package stamp charge of 25 cents. When a tobacco manufacturer challenged the stamp charge, we upheld the charge on the basis that the stamps were designed to prevent fraud in the export exemption from the excise tax and did not, therefore, represent a tax on exports. 92 U. S., at 375. When Congress later repealed the 25-cent charge for the exemption stamp in a statute that referred to the stamp as an "export tax," another manufacturer sued to recover the money it had paid for the exemption stamps. See *Turpin, supra.* Without disturbing the prior ruling in *Pace* that the stamp charge was not a tax on exports, 117 U. S., at 505, we explained that the prohibition of the Export Clause "has reference to the imposition of duties on goods by reason or because of their exportation or intended exportation, or whilst they are being exported," *id.*, at 507. We said that the plaintiffs would have had no Export Clause claim even if there had been no exemption from the excise because the goods were not in the course of exportation and might never be exported. *Ibid.* *Turpin* broadly suggested that the Export Clause prohibits both taxes levied on goods in the course of exportation and taxes directed specifically at exports.

In *Cornell*, the Court addressed whether the Export Clause prohibited application of a federal excise tax on filled cheese manufactured under contract for export. Looking to the analysis set out in *Turpin*, we rejected the contention that the Export Clause bars application of a nondiscriminatory tax imposed before the product entered the course of exportation. "The true construction of the constitutional provision is that no burden by way of tax or duty can be cast upon the exportation of articles, and does not mean that articles exported are relieved from the prior ordinary burdens of taxation which rest upon all property similarly situ-

ated." *Cornell, supra,* at 427. *Pace, Turpin,* and *Cornell* made clear that nondiscriminatory pre-exportation assessments do not violate the Export Clause, even if the goods are eventually exported.

At the same time we were defining a domain within which nondiscriminatory taxes could permissibly be imposed on goods intended for export, we were also making clear that the Export Clause strictly prohibits any tax or duty, discriminatory or not, that falls on exports during the course of exportation. See *Fairbank* v. *United States,* 181 U. S. 283 (1901); *United States* v. *Hvoslef,* 237 U. S. 1 (1915); *Thames & Mersey Marine Ins. Co.* v. *United States, supra.* In *Fairbank,* for example, we addressed a federal stamp tax on bills of lading for export shipments imposed by the War Revenue Act of 1898. The Court found that the tax was facially discriminatory, 181 U. S., at 290, and, though not directly imposed on the goods being exported, the tax was nevertheless "in effect a duty on the article transported," *id.,* at 294. Consequently, the tax fell directly into the category of forbidden taxes on exports defined in *Turpin.* In striking down the tax, we said:

> "The requirement of the Constitution is that exports should be free from any governmental burden. The language is 'no tax or duty.' Whether such provision is or is not wise is a question of policy with which the courts have nothing to do. We know historically that it was one of the compromises which entered into and made possible the adoption of the Constitution. It is a restriction on the power of Congress . . . ." 181 U. S., at 290.

*Hvoslef* and *Thames & Mersey* differed from *Fairbank* in that the taxes imposed in those cases—on ship charters and marine insurance, respectively—did not facially discriminate against exports. The Court nonetheless prohibited the application of those generally applicable, nondiscriminatory

taxes to the transactions at issue because each tax was, in effect, a tax on exports. The type of charter contract at issue in *Hvoslef* was "in contemplation of law a mere contract of affreightment," 237 U. S., at 16, and we found that the tax, as applied to charters for exportation, "was in substance a tax on the exportation; and a tax on the exportation is a tax on the exports," *id.*, at 17. Likewise, in *Thames & Mersey*, we found that "proper insurance during the voyage is one of the necessities of exportation" and that "the taxation of policies insuring cargoes during their transit to foreign ports is as much a burden on exporting as if it were laid on the charter parties, the bills of lading, or the goods themselves." 237 U. S., at 27.

Shortly after *Hvoslef* and *Thames & Mersey*, the Court rejected an attempt to shield from taxation the net income of a company engaged in the export business. *William E. Peck & Co.* v. *Lowe*, 247 U. S. 165 (1918). In accordance with the analysis set out in *Turpin*, we found both that the tax was nondiscriminatory and that "[i]t is not laid on articles in course of exportation or on anything which inherently or by the usages of commerce is embraced in exportation or any of its processes." 247 U. S., at 174.

Only a few years later the Court struck down the application of a tax on the export sale of certain baseball equipment. See *A. G. Spalding & Bros.* v. *Edwards*, 262 U. S. 66 (1923). Although the tax was clearly nondiscriminatory, we explained that the goods being taxed had entered the course of exportation when they were delivered to the export carrier. *Id.*, at 70. Because the taxable event, the transfer of title, occurred at the same moment the goods entered the course of exportation, we held that the tax could not constitutionally be applied to the export sale. *Id.*, at 69–70.

The Court has strictly enforced the Export Clause's prohibition against federal taxation of goods in export transit, and we have extended that protection to certain services and activities closely related to the export process. We have not,

however, exempted pre-export goods and services from ordinary tax burdens; nor have we exempted from federal taxation various services and activities only tangentially related to the export process.

## III

The Government concedes, as it did below, that this case is largely indistinguishable from *Thames & Mersey* and that, if *Thames & Mersey* is still good law, the tax assessed against IBM under § 4371 violates the Export Clause. See Tr. of Oral Arg. 5; 59 F. 3d, at 1237. The parties apparently agree that there is no legally significant distinction between the insurance policies at issue in this case and those at issue in *Thames & Mersey*, and, accordingly, the Government asks that we overrule *Thames & Mersey*.

The Government asserts that the Export Clause permits the imposition of generally applicable, nondiscriminatory taxes, even on goods in export transit. The Government urges that we have historically interpreted the Commerce, Import-Export, and Export Clauses in harmony and that we have rejected the theory underlying *Thames & Mersey* in the context of the Commerce and Import-Export Clauses. Accordingly, the Government contends that our Export Clause jurisprudence, symbolized by *Thames & Mersey*, has become an anachronism in need of modernization. The Government asks us to reinterpret the Export Clause to permit the imposition of generally applicable, nondiscriminatory taxes as we have under the Commerce Clause and, it argues, under the Import-Export Clause.

## A

The Government contends that our dormant Commerce Clause jurisprudence has shifted dramatically and that our traditional understanding of the Export Clause, which is based partly on an outmoded view of the Commerce Clause, can no longer be justified. It is true that some of our early Export Clause cases relied on an interpretation of the

Commerce Clause that we have since rejected. In *Fairbank*, 181 U. S., at 298–300, for example, we analogized to *Robbins* v. *Shelby County Taxing Dist.*, 120 U. S. 489, 497 (1887), in which we held that "[i]nterstate commerce cannot be taxed at all [by the States], even though the same amount of tax should be laid on domestic commerce, or that which is carried on solely within the state." Referring to the categorical ban on taxation of interstate commerce declared in *Robbins*, we likened the scope of the Commerce Clause's ban on state taxation of interstate commerce to the Export Clause's ban on federal taxation of exports. *Fairbank, supra*, at 300; see also *Hvoslef*, 237 U. S., at 15 ("The court [in *Fairbank*] found an analogy in the construction which had been given to the commerce clause in protecting interstate commerce from state legislation imposing direct burdens"). After *Thames & Mersey*, the Commerce Clause construction espoused in *Robbins* fell out of favor, see *Western Live Stock* v. *Bureau of Revenue*, 303 U. S. 250, 254 (1938) ("It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business"), and we expressly disavowed that view in *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274, 288–289 (1977).

Our rejection in *Complete Auto* of much of our early dormant Commerce Clause jurisprudence did not, however, signal a similar rejection of our Export Clause cases. Our decades-long struggle over the meaning of the nontextual negative command of the dormant Commerce Clause does not lead to the conclusion that our interpretation of the textual command of the Export Clause is equally fluid. At one time, the Court may have thought that the dormant Commerce Clause required a strict ban on state taxation of interstate commerce, but the text did not require that view.[2]

---

[2] The Commerce Clause is an express grant of power to Congress to "regulate Commerce . . . among the several States." U. S. Const., Art. I, §8, cl. 3. It does not expressly prohibit the States from doing anything,

The text of the Export Clause, on the other hand, expressly prohibits Congress from laying any tax or duty on exports. These textual disparities strongly suggest that shifts in the Court's view of the scope of the dormant Commerce Clause should not, and indeed cannot, govern our interpretation of the Export Clause. Cf. *Richfield Oil Corp.* v. *State Bd. of Equalization,* 329 U. S. 69, 75–76 (1946) (distinguishing accommodations made under the Commerce Clause from the express textual prohibition of the Import-Export Clause).

## B

The Government's primary assertion is that modifications in our Import-Export Clause jurisprudence require parallel modifications in the Export Clause context. More specifically, the Government argues that our decisions in *Michelin Tire Corp.* v. *Wages,* 423 U. S. 276 (1976), and *Department of Revenue of Wash.* v. *Association of Wash. Stevedoring Cos.,* 435 U. S. 734 (1978), establish that States may impose generally applicable, nondiscriminatory taxes even if those taxes fall on imports or exports. The Export Clause, the Government contends, is no more restrictive.

The Import-Export Clause, which is textually similar to the Export Clause, says in relevant part, "No State shall . . . lay any Imposts or Duties on Imports or Exports." U. S. Const., Art. I, § 10, cl. 2. Though minor textual differences exist and the Clauses are directed at different sovereigns, historically both have been treated as broad bans on taxation of exports, and in several cases the Court has interpreted the provisions of the two Clauses in tandem. For instance, in the Court's first decision interpreting the Import-Export Clause, Chief Justice Marshall said:

---

though we have long recognized negative implications of the Clause that prevent certain state taxation even when Congress has failed to legislate. See *Fulton Corp.* v. *Faulkner,* 516 U. S. 325, 330–331 (1996); *Quill Corp.* v. *North Dakota,* 504 U. S. 298, 309 (1992).

"The States are forbidden to lay a duty on exports, and the United States are forbidden to lay a tax or duty on articles exported from any State. There is some diversity in language, but none is perceivable in the act which is prohibited." *Brown* v. *Maryland,* 12 Wheat. 419, 445 (1827).

See also *Kosydar* v. *National Cash Register Co.,* 417 U. S. 62, 67, n. 5 (1974); *Hvoslef, supra,* at 13–14; *Cornell,* 192 U. S., at 427–428; *Turpin,* 117 U. S., at 506–507. The Government argues that our longstanding parallel interpretations of the two Clauses require judgment in its favor. We disagree.

In *Michelin,* we addressed whether a State could impose a nondiscriminatory ad valorem property tax on imported goods that were no longer in import transit. Michelin, which imported tires from Canada and France and stored them in a warehouse, argued that Georgia could not constitutionally assess ad valorem property taxes against its imported tires. We explained that "[t]he Framers of the Constitution . . . sought to alleviate three main concerns": (i) ensuring that the Federal Government speaks with one voice when regulating foreign commerce; (ii) preserving import revenues as a major source of federal revenue; and (iii) preventing disharmony likely to be caused if seaboard States taxed goods coming through their ports. *Michelin, supra,* at 285–286. The Court found that nondiscriminatory ad valorem taxes violate none of these policies. A century earlier, however, the Court had ruled that, under the "original package doctrine," a State could not impose such a tax until the goods had lost their character as imports and had been incorporated into the mass of property in the State. *Low* v. *Austin,* 13 Wall. 29, 34 (1872). The *Michelin* Court overruled *Low* and held that the nondiscriminatory property tax levied on Michelin's inventory of imported tires did not violate the Import-Export Clause because it was not an impost or duty on imports. 423 U. S., at 301. See also *Limbach* v. *Hooven & Allison Co.,* 466 U. S. 353 (1984) (reaffirming that

*Michelin* expressly overruled the original package doctrine altogether and not merely *Low* on its facts).

Two years later, in *Washington Stevedoring*, we upheld against an Import-Export Clause challenge a nondiscriminatory state tax assessed against the compensation received by stevedoring companies for services performed within the State. The Court found that Washington's stevedoring tax did not violate the policies underlying the Import-Export Clause. Unlike the property tax at issue in *Michelin,* the activity taxed by Washington occurred while imports and exports were in transit. That fact was not dispositive, however, because the tax did not fall on the goods themselves:

> "The levy reaches only the business of loading and unloading ships or, in other words, the business of transporting cargo within the State of Washington. Despite the existence of the first distinction, the presence of the second leads to the conclusion that the Washington tax is not a prohibited 'Impost or Duty' when it violates none of the policies [that animate the Import-Export Clause]." *Washington Stevedoring, supra,* at 755.

Relying on *Canton R. Co.* v. *Rogan,* 340 U. S. 511 (1951), which upheld a tax on the gross receipts of a railroad that operated a marine terminal and transported imports and exports, we ruled in *Washington Stevedoring* that taxation of transportation services, whether by railroad on the docks or by stevedores loading and unloading ships, did not relate to the value of the goods and could not be considered imposts or duties on the goods themselves. 435 U. S., at 757.

1

A tax on policies insuring exports is not, precisely speaking, the same as a tax on exports, but *Thames & Mersey* held that they were functionally the same under the Export Clause. We noted in *Washington Stevedoring* that one may question the finding in *Thames & Mersey* that the tax was

essentially a tax upon the exportation itself. 435 U. S., at 756, n. 21. We expressed concern that "[t]he basis for distinguishing *Thames & Mersey* is less clear" than for *Fairbank* or *Richfield Oil,* because the marine insurance policies in *Thames & Mersey* arguably "had a value apart from the value of the goods." 435 U. S., at 756, n. 21. Nevertheless, the Government apparently has chosen not to challenge that aspect of *Thames & Mersey* in this case. Tr. of Oral Arg. 5, 8–9, 40. When questioned on that implicit concession at oral argument, the Government admitted that it "chose not to" argue that § 4371 does not impose a tax on the goods themselves. *Id.,* at 9. It would be inappropriate for us to reexamine in this case, without the benefit of the parties' briefing, whether the policies on which § 4371 is assessed are so closely connected to the goods that the tax is, in essence, a tax on exports.[3] See, *e. g., id.,* at 27–28 ("[T]he record doesn't reveal the sort of statistical information Justice Breyer was suggesting might be relevant" to determine "whether this is sufficiently indirect that it's not a tax on

---

[3] The Court has never held that the Export Clause prohibits only direct taxation of goods in export transit. In *Brown* v. *Maryland,* 12 Wheat. 419 (1827), Chief Justice Marshall expressed in dicta his skepticism that a federal occupational tax on exporters could pass scrutiny under the Export Clause. *Id.,* at 445 ("[W]ould government be permitted to shield itself from the just censure to which this attempt to evade the prohibitions of the constitution would expose it, by saying that this was a tax on the person, not on the article, and that the legislature had a right to tax occupations?"). In *Fairbank, Hvoslef,* and *Thames & Mersey,* we struck down taxes that were not assessed directly on goods in export transit, but which the Court found to be so closely related as to be effectively a tax on the goods themselves. We have never repudiated that principle, but neither have we ever carefully defined how we decide whether a particular federal tax is sufficiently related to the goods or their value to violate the Export Clause. To the extent the issue was raised in the petition for certiorari, the Government failed to address the issue in its brief on the merits and therefore has abandoned it. See *Posters 'N' Things, Ltd.* v. *United States,* 511 U. S. 513, 527 (1994); *Russell* v. *United States,* 369 U. S. 749, 754, n. 7 (1962).

exports, . . . because the Government has conceded through-out that they are not disputing that this tax, if discrimina-tory, is in violation of the Constitution").

*Stare decisis* is a "principle of policy," *Helvering* v. *Hallock*, 309 U. S. 106, 119 (1940), and not "an inexorable command," *Payne* v. *Tennessee*, 501 U. S. 808, 828 (1991). Applying that policy, we frequently have declined to over-rule cases in appropriate circumstances because *stare decisis* "promotes the evenhanded, predictable, and consistent devel-opment of legal principles, fosters reliance on judicial deci-sions, and contributes to the actual and perceived integrity of the judicial process." *Id.*, at 827. "[E]ven in constitu-tional cases, the doctrine carries such persuasive force that we have always required a departure from precedent to be supported by some 'special justification.'" *Id.*, at 842 (SOUTER, J., concurring) (quoting *Arizona* v. *Rumsey*, 467 U. S. 203, 212 (1984)).

Though from time to time we have overruled governing decisions that are "unworkable or are badly reasoned," *Payne, supra*, at 827; see *Smith* v. *Allwright*, 321 U. S. 649, 665 (1944), we have rarely done so on grounds not advanced by the parties. *Thames & Mersey* has been controlling precedent for over 80 years, and the Government does not, indeed could not, argue that the rule established there is "unworkable." Despite the dissent's speculative protesta-tions to the contrary, *post*, at 871–872, there is simply no evidence that *Thames & Mersey* has caused or will cause uncertainty in commercial export transactions. The princi-ples that animate our policy of *stare decisis* caution against overruling a longstanding precedent on a theory not argued by the parties, and we decline to do so in this case.[4]

---

[4] The dissent suggests that "the Court assumes the statute to be invalid rather than deciding it to be so." *Post*, at 864. We make no such assump-tions. Rather, we begin with a longstanding decision that, by all ac-counts, controls this case. Even the Government agrees that Congress enacted a law whose application in this case directly contravenes our hold-

## 2

What the Government does argue is that our Import-Export Clause cases require us to overrule *Thames & Mersey*.[5] We have good reason to hesitate before adopting the analysis of our recent Import-Export Clause cases into our Export Clause jurisprudence. Though we have frequently interpreted the Clauses together, see *supra*, at 852–854, our more recent Import-Export Clause cases, on which the Government relies, caution that meaningful textual differences exist and should not be overlooked. The Export Clause prohibits Congress from laying any "Tax or Duty" on exports, while the Import-Export Clause prevents the States from laying any "Imposts or Duties" on imports or exports. In both *Michelin* and *Washington Stevedoring*, we left open the possibility that a particular state assessment might not properly be called an impost or duty, and thus would be beyond the reach of the Import-Export Clause, while an identical federal assessment might properly be called a tax and would be subject to the Export Clause. Though we found in *Michelin* that a nondiscriminatory state property tax does not transgress the policy dictates of the Import-Export Clause, we also recognized that the Import-Export Clause is "not written in terms of a broad prohibition of every 'tax,'" and that impost and duty are narrower terms than tax. 423 U. S., at 290–293. In *Washington Stevedoring*, we likewise rejected the assertion that the Import-Export Clause absolutely prohibits all taxation of imports and exports. 435 U. S., at 759. We said that "the term 'Impost or Duty' is not self-defining and does not necessarily encompass all taxes" and that the respondents' argument to

ing in *Thames & Mersey*. We sit not to condemn § 4371, but rather to determine whether it is to be saved by overruling binding precedent.

[5] The dissent suggests that we make a "serious mistake" in deciding whether a nondiscriminatory tax on goods violates the Export Clause, *post*, at 881. We do not agree that it is a mistake to address the arguments actually advanced by the parties.

the contrary ignored "the central holding of *Michelin* that the absolute ban is only of 'Imposts or Duties' and not of all taxes." *Ibid.*

The distinction between imposts or duties and taxes is especially pertinent in light of the peculiar definitional analysis we chose in *Michelin*. Finding substantial ambiguity in the phrase "Imposts or Duties," we "decline[d] to presume it was intended to embrace taxation that does not create the evils the Clause was specifically intended to eliminate." 423 U. S., at 293–294. We entirely bypassed the etymological inquiry into the proper meaning of the terms "impost" and "duty," and instead created a regime in which those terms are conclusions to be drawn from an examination into whether a particular assessment "was the type of exaction that was regarded as objectionable by the Framers of the Constitution." *Id.*, at 286. We are not prepared to say that the word "Tax" is "sufficiently ambiguous," *id.*, at 293, that we may ignore its common, and usually expansive,[6] meaning in favor of an Export Clause decisional rule in which a tax is not a "Tax" unless it discriminates against exports. Consequently, *Michelin* and *Washington Stevedoring*, which held that the assessments in question were not "Imposts or Duties" at all, do not logically validate the assessment at issue in this case, which, by all accounts, remains a "Tax."

It is not intuitively obvious that *Michelin*'s three-pronged analysis of the Framers' concerns is really just another way of stating a nondiscrimination principle. But even if it were, the Government cannot reasonably rely on *Michelin* to govern the Export Clause because *Michelin* drew its analysis around the phrase "Imposts or Duties" and expressly ex-

---

[6] Though *Michelin* discusses "taxes" in terms of "every exaction," 423 U. S., at 290, it also suggests that at the time of the founding "probably only capitation, land, and general property exactions were known by the term 'tax' rather than the term 'duty,'" *id.*, at 291. In any event, the *Michelin* Court understood that the terms used in the Export Clause were broader than those used in the Import-Export Clause.

cluded the broader term "Tax" that appears in the Export Clause. *Michelin* marked a more permissive approach to state taxation under the Import-Export Clause only by distinguishing the presumptively stricter language of the Export Clause. We agree with the Government that *Michelin* informs our decision in this case, but not in a way that supports the Government's position. It is simply no longer true that the Court perceives no substantive difference between the two Clauses.

We are similarly hesitant to adopt the Import-Export Clause's policy-based analysis without some indication that the Export Clause was intended to alleviate the same "evils" to which the Import-Export Clause was directed. Unlike the Import-Export Clause, which was intended to protect federal supremacy in international commerce, to preserve federal revenue from import duties and imposts, and to prevent coastal States with ports from taking unfair advantage of inland States, see *Michelin, supra,* at 285–286, the Export Clause serves none of those goals. Indeed, textually, the Export Clause does quite the opposite. It specifically prohibits Congress from regulating international commerce through export taxes, disallows any attempt to raise federal revenue from exports, and has no direct effect on the way the States treat imports and exports.

As a purely historical matter, the Export Clause was originally proposed by delegates to the Federal Convention from the Southern States, who feared that the Northern States would control Congress and would use taxes and duties on exports to raise a disproportionate share of federal revenues from the South. See 2 M. Farrand, The Records of the Federal Convention of 1787, pp. 95, 305–308, 359–363 (rev. ed. 1966). The Government argues that this "narrow historical purpose" justifies a narrow interpretation of the text and that application of § 4371 to policies insuring exports does not conflict with the policies embodied in the Clause. Brief for United States 32–34. While the original impetus may

have had a narrow focus, the remedial provision that ultimately became the Export Clause does not, and there is substantial evidence from the Debates that proponents of the Clause fully intended the breadth of scope that is evident in the language. See, *e. g.*, 2 Farrand, Records of the Federal Convention, *supra*, at 220 (Mr. King: "In two great points the hands of the Legislature were absolutely tied. The importation of slaves could not be prohibited—exports could not be taxed"); *id.*, at 305 ("Mr. Mason urged the necessity of connecting with the power of levying taxes . . . that no tax should be laid on exports"); *id.*, at 360 (Mr. Elseworth *[sic]:* "There are solid reasons agst. Congs taxing exports"); *ibid.* ("Mr. Butler was strenuously opposed to a power over exports"); *id.*, at 361 (Mr. Sherman: "It is best to prohibit the National legislature in all cases"); *id.*, at 362 ("Mr. Gerry was strenuously opposed to the power over exports").

The Government argued for a different narrow interpretation of the Export Clause in *Fairbank*. See 181 U. S., at 292–293. Arguing that the Debates expressed a primary interest in diffusing sectional conflicts, the Government urged the *Fairbank* Court to interpret the Export Clause to permit taxation of "the act of exportation or the document evidencing the receipt of goods for export, for these exist with substantial uniformity throughout the country." *Id.*, at 292. We rejected that argument:

> "If mere discrimination between the States was all that was contemplated, it would seem to follow that an *ad valorem* tax upon all exports would not be obnoxious to this constitutional prohibition. But surely under this limitation Congress can impose an export tax neither on one article of export, nor on all articles of export." *Ibid.*

As in *Fairbank*, we think the text of the constitutional provision provides a better decisional guide than that offered by

the Government. The Government's policy argument—that the Framers intended the Export Clause to narrowly alleviate the fear of northern repression through taxation of southern exports by prohibiting only discriminatory taxes—cannot be squared with the broad language of the Clause. The better reading, that adopted by our earlier cases, is that the Framers sought to alleviate their concerns by completely denying to Congress the power to tax exports at all.

3

Even assuming that *Michelin* and *Washington Stevedoring* govern our Export Clause inquiry in this case, the Government's argument falls short of its goal. Our holdings in *Michelin* and *Washington Stevedoring* do not reach the facts of this case and, more importantly, do not interpret the Import-Export Clause to permit assessment of nondiscriminatory taxes on imports and exports in transit. *Michelin* involved a tax on goods, but the goods were no longer in transit. The tax in *Washington Stevedoring* burdened imports and exports while they were still in transit, but it did not fall directly on the goods themselves. This case, as it comes to us, is a hybrid in which the tax both burdens exports during transit and—as the Government concedes and our earlier cases held—is essentially a tax on the goods themselves. The Government argues that *Michelin* and *Washington Stevedoring* by analogy permit Congress to impose generally applicable, nondiscriminatory taxes that fall directly on exports in transit. Brief for United States 32 (*Michelin* and *Washington Stevedoring* "demonstrate that, when a generally applicable, nondiscriminatory tax is at issue, the mere fact that the tax applies also to goods that are in the export or import process does not provide a constitutional immunity from taxation"). If this contention is to succeed, the Government at the very least must show that our Import-Export Clause jurisprudence now permits a

State to impose a nondiscriminatory tax directly on goods in import or export transit. We think the Government has failed to make that showing.

The Court has never upheld a state tax assessed directly on goods in import or export transit. In *Michelin,* we suggested that the Import-Export Clause would invalidate application of a nondiscriminatory property tax to goods still in import or export transit. 423 U. S., at 290 (compliance with the Import-Export Clause may be secured "by prohibiting the assessment of even nondiscriminatory property taxes on [import or export] goods which are merely in transit through the State when the tax is assessed"). See also *Virginia Indonesia Co.* v. *Harris County Appraisal Dist.,* 910 S. W. 2d 905, 915 (Tex. 1995) (invalidating application of a nondiscriminatory ad valorem property tax to goods in export transit).

We also declined to endorse the Government's theory in *Washington Stevedoring.* After reciting that the Court in *Canton R. Co.* had distinguished *Thames & Mersey, Fairbank,* and *Richfield Oil,* we pointed out that in those cases "the State [or Federal Government] had taxed either the goods or activity so connected with the goods that the levy amounted to a tax on the goods themselves." *Washington Stevedoring,* 435 U. S., at 756, n. 21. We expressly declined to "reach the question of the applicability of the *Michelin* approach when a State directly taxes imports or exports in transit," *id.,* at 757, n. 23, because, although the goods in that case were in transit, the tax fell on "a service distinct from the goods and their value," *id.,* at 757. Thus, contrary to the Government's contention, this Court's Import-Export Clause cases have not upheld the validity of generally applicable, nondiscriminatory taxes that fall on imports or exports in transit. We think those cases leave us free to follow the express textual command of the Export Clause to prohibit the application of any tax "laid on Articles exported from any State."

* * *

We conclude that the Export Clause does not permit assessment of nondiscriminatory federal taxes on goods in export transit. Reexamination of the question whether a particular assessment on an activity or service is so closely connected to the goods as to amount to a tax on the goods themselves must await another day. We decline to overrule *Thames & Mersey*. The judgment of the Court of Appeals for the Federal Circuit is affirmed.

*It is so ordered.*

JUSTICE STEVENS took no part in the consideration or decision of this case.

JUSTICE KENNEDY, with whom JUSTICE GINSBURG joins, dissenting.

The Court today holds a federal statute unconstitutional without giving heed to the simplest reason for sustaining it. We granted certiorari on the question "[w]hether, as applied to casualty insurance for losses incurred during the shipment of goods from locations within the United States to purchasers abroad, the tax imposed by Section 4371 of the Internal Revenue Code violates the Export Clause of the Constitution of the United States (U. S. Const. Art. I, § 9, Cl. 5)," Pet. for Cert. I. A straightforward answer to the question presented requires us to address the narrow issue of the continuing validity of our holding in *Thames & Mersey Marine Ins. Co. v. United States*, 237 U. S. 19 (1915), that a general tax on certain insurance premiums, as applied to exporters, is a prohibited tax on export goods.

Rejecting this course, the Court ventures upon a broad constitutional inquiry not even implicated by the statute. To do so, it rewrites the question presented. In the first sentence of the opinion, the Court says, "We resolve in this case whether the Export Clause of the Constitution permits the imposition of a generally applicable, nondiscriminatory

federal tax on goods in export transit," *ante*, at 845. In so reformulating the question, the Court makes the assumption that § 4371's insurance tax is a tax on export goods, thereby adopting the premise of *Thames & Mersey* that I had thought we were to address. In the end the Court assumes the statute to be invalid rather than deciding it to be so. I find no precedent for setting aside an Act of Congress in this peremptory way. Worse yet, the Court's assumption is wrong; because § 4371 taxes a service distinct from the goods and is not a proxy for taxing the goods, it does not fall within the prohibition of the Export Clause. The Court thus carves out an undeserved exemption from § 4371 for exporters, adding significant complexity to its administration. Moreover, in a case in which the Export Clause should not even apply, the Court tackles the great problem of reconciling our Export Clause jurisprudence with modern decisions interpreting the Commerce and Import-Export Clauses, U. S. Const., Art. I, § 8, cl. 2, and Art. I, § 10, cl. 2. This is unwise and unnecessary. I would limit the inquiry to a reconsideration of *Thames & Mersey*, and uphold the statute as applied to respondent. With respect, I dissent.

I

We consider a rather simple federal tax. Section 4371 of the Internal Revenue Code imposes a tax of "4 cents on each dollar, or fractional part thereof, of the premium paid on the policy of casualty insurance or the indemnity bond, if issued to or for, or in the name of, an insured . . . ." 26 U. S. C. § 4371(1) (1982 ed.). The term "insured" is defined to include any "domestic corporation or partnership, or an individual resident of the United States, against, or with respect to, hazards, risks, losses, or liabilities wholly or partly within the United States . . . ." § 4372(d)(1). The statute does not discriminate against exports. Indeed, it does not even mention them. The tax must be paid not only by domestic traders but also by any insured, even an individual, who is cov-

ered in whole or in part for domestic casualty risks. The purpose of the tax is to "eliminate an unwarranted competitive advantage now favoring foreign insurers," H. R. Rep. No. 2333, 77th Cong., 2d Sess., 61 (1942), who do not pay federal income tax. Cf. 26 U. S. C. § 4373(1) (1982 ed.) (exempting from § 4371 any policy issued by a foreign insurer that is "signed or countersigned by an officer or agent of the insurer in a State, or in the District of Columbia, within which such insurer is authorized to do business" and is therefore subject to the income tax).

Resolution of the case requires us to determine whether the Export Clause has any bearing on taxes on services like insurance provided to exporters, where the service itself is not exported. The plain text of the Clause casts much doubt on the proposition. It states: "No Tax or Duty shall be laid on Articles exported from any State," U. S. Const., Art. I, § 9, cl. 5. The majority avoids this necessary question by asserting that the Government failed to argue the point and so abandoned it. *Ante*, at 855, and n. 3. True, the Government defends § 4371 on the ground that it does not discriminate between exports and other forms of trade, but this is not a concession that there is no distinction between a tax on insurance premiums and a tax on goods. In fact, the Government makes repeated references to the distinction in its briefs, albeit in the context of discussing the nondiscriminatory character of § 4371. See, *e. g.*, Brief for United States 12–13 (The tax "does not apply specifically to export transactions; to the contrary, it applies only to insurance risks that are either 'wholly' or 'partly' domestic"); *id.*, at 15 ("The tax imposed by Section 4371 of the Internal Revenue Code is not specifically directed to nor directly 'laid on Articles exported' (U. S. Const. Art. I, § 9, Cl. 5). Instead, it applies to insurance premiums paid to foreign insurers for many forms of insurance, including any casualty risk that is 'wholly or partly within the United States' (26 U. S. C. § 4372(d)(1))"); *id.*, at 34 ("Even as applied to casualty insurance, the tax

unquestionably has only an incidental and remote relationship to exports and the export process . . .").

At oral argument, the Assistant to the Solicitor General acknowledged that he had not made a separate argument based on the distinction between export goods and services related to the exporting process. He explained that the nondiscrimination theory had greater utility, sparing courts the nettlesome inquiry into what is an export. Tr. of Oral Arg. 9. When asked why the Government was avoiding the simpler and clearer argument that § 4371 was just a tax on foreign insurers to offset the tax burdens borne by domestic insurers, he responded, "We do not mean to avoid that argument. That's part of our argument of why this is a tax of general application." *Id.*, at 12. Later in oral argument, he stated that "it's problematic to describe a tax on insurance as a tax on the good," and cited that problem as a reason for calling into question our decision in *Thames & Mersey.* Tr. of Oral Arg. 40. When asked if his position had foreclosed us from deciding the case on that basis, he responded: "I don't believe you're foreclosed . . . by our concession from addressing that issue as you see fit." *Ibid.* We have relied on statements more equivocal than this to reconsider and overrule a bad precedent even when the parties in their briefs had argued that the precedent should be upheld. See *Blonder-Tongue Laboratories, Inc.* v. *University of Ill. Foundation*, 402 U. S. 313, 319–320 (1971).

The Court's faulty characterization of the Government's argument leads it down some odd byways. For example, in Part III–B–3, the Court rejects the Government's attempt to rely upon *Department of Revenue of Wash.* v. *Association of Wash. Stevedoring Cos.*, 435 U. S. 734 (1978), where we held that a state tax of general applicability imposed upon a stevedoring firm did not violate the Import-Export Clause even though it may have added to the cost of importing and exporting. The Court points out that the tax in *Washington Stevedoring* did not fall directly on the goods, *ante*, at 861,

and that we reserved the question whether States could tax goods in import or export transit, *ante*, at 862 (citing 435 U. S., at 757, n. 23). So, in the Court's view, *Washington Stevedoring* does not support the Government's argument that "Congress [may] impose generally applicable, nondiscriminatory taxes that fall directly on exports in transit," *ante*, at 861. The Government never argues that § 4371 imposes a tax on goods in transit, however. See, *e. g.*, Brief for United States 15 (the tax imposed by § 4371 "does not fall specifically on articles of export or export transactions"). If the Government can be faulted, it is for urging us to uphold § 4371 on a broad theory (a tax that does not discriminate against exports is valid) rather than the narrow theory subsumed within it (this particular tax does not fall on export goods at all). Nothing in the Government's argument prevents us from deciding the case on the narrower ground.

Even were we to suppose that the Government did not argue the goods and services distinction, the prudential rule against deciding a case on an unargued theory is in any event not absolute. See *Arcadia* v. *Ohio Power Co.*, 498 U. S. 73, 77 (1990); *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 77–78 (1938) (overturning *Swift* v. *Tyson*, 16 Pet. 1 (1842), as unconstitutional); see also 304 U. S., at 82 (Butler, J.) (pointing out that no constitutional question was argued or briefed either in this Court or the court below). Cf. *Evans* v. *United States*, 504 U. S. 255, 269 (1992) (addressing a theory not argued by the parties but advanced by JUSTICE THOMAS in dissent); *United States* v. *Burke*, 504 U. S. 229, 246 (1992) (SCALIA, J., concurring in judgment). This rule has less force when the issue before us is whether it is constitutional to apply the statute where Congress intended it to apply. The predicate question of whether the Export Clause prohibits taxes on distinct services like insurance is "essential to the analysis" of the question presented, *Procunier* v. *Navarette*, 434 U. S. 555, 559–560, n. 6 (1978), and necessary to "an intelligent resolution of the constitutionality" of the statute, *Vance* v.

*Terrazas,* 444 U. S. 252, 258, n. 5 (1980). It is before us and should be decided. See this Court's Rule 14.1(a) ("The statement of any question presented will be deemed to comprise every subsidiary question fairly included therein").

To give Congress the respect it is owed, we must decide whether the statute is in fact unconstitutional as applied, not make the borderline call that the Government's litigation position bars us from reaching a question which, as the Court seems to agree, is presented by the case. In interpreting statutes, for example, we have long observed "[t]he elementary rule . . . that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Hooper* v. *California,* 155 U. S. 648, 657 (1895). See also *United States ex rel. Attorney General* v. *Delaware & Hudson Co.,* 213 U. S. 366, 408 (1909) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter"); *Murray* v. *Schooner Charming Betsy,* 2 Cranch 64, 118 (1804).

> "This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council,* 485 U. S. 568, 575 (1988).

We have not considered ourselves foreclosed from adopting saving constructions the parties failed to suggest. See, *e. g.,* *Panama R. Co.* v. *Johnson,* 264 U. S. 375, 389–391 (1924) (interpreting Jones Act to allow action to be brought in admiralty); cf. Brief for Plaintiff-in-Error 9–22 and Brief for

Defendant-in-Error 3–12, in *Panama R. Co.* v. *Johnson*, O. T. 1923, No. 369. We cannot here avoid a constitutional question by statutory construction, but we should take all measures to avoid declaring that Congress "usurp[ed] power constitutionally forbidden it," *DeBartolo, supra,* at 575. The majority cites no case in which we have declared a federal statute unconstitutional by disregarding an unargued theory that would save the statute, and I am not aware of any. We should at least consider a construction of the Export Clause that would render it inapplicable to the statute, rather than assuming the issue away and reaching the unnecessary judgment that a coordinate branch violated the Constitution.

There may be instances, even in constitutional cases, when we should eschew alternative theories for sustaining a statute. For example, we might do so if the theories depend upon different provisions of law or require factual development and legal analysis far afield from that done by the parties or the courts below. That is not this case. The question whether the Export Clause applies to taxes on distinct export-related services requires most of the same inquiries the majority undertakes: construing the text of the Export Clause, considering its history and purpose, and reviewing our precedents. It also requires explicit reexamination of the reasoning of *Thames & Mersey Marine Ins. Co.* v. *United States,* 237 U. S. 19 (1915), which the Government has asked us to overrule, in particular the idea that a tax on insurance premiums is a tax on the goods. The last is the only step the Court refuses to take.

There is not, as the Court intimates, *ante,* at 855, a need for statistical development of the relative incidence of this tax on exporters, unless the Court (as appears unlikely) is interested in the statistics from 1942 to determine if the statute was a pretext when it was enacted. The current incidence of the tax on exporters, whatever it is, will reflect market conditions in light of the operation of this tax over more than 50 years, including the strength of foreign insur-

ers in certain lines exporters purchase, cf. R. Holtom, Underwriting Principles & Practices 451 (3d ed. 1987) (ocean marine insurance dominated by foreign companies). There is no law prohibiting persons from being insured under policies of foreign insurers issued abroad, and nothing in the statute exempts nonexporters from its operation. The Court has all the information it needs to decide this case on the proper basis, and it should not rest its decision that § 4371 is unconstitutional upon a dubious assumption that a general tax on insurance premiums is a tax on export goods.

In *Massachusetts* v. *United States*, 333 U. S. 611 (1948), the Government had conceded certain matters of statutory construction which, we felt, undermined its entire position. *Id.*, at 624. We refused to accept those concessions, and, giving the statute its proper interpretation, ruled in the Government's favor. *Id.*, at 625. It mystifies me that in a constitutional case, where our decision is not subject to congressional revision, the Court here accepts the Government's purported concession of the meaning of the Export Clause without any independent examination of the question, and then invokes the Clause to strike down a statute. See *Torres* v. *Puerto Rico*, 442 U. S. 465, 471, n. 3 (1979) ("[E]ven an explicit concession" by the Commonwealth of Puerto Rico that it was subject to the requirements of the Fourth Amendment would not "relieve this Court of the performance of the judicial function of deciding the issue") (internal quotation marks omitted).

Quite apart from the unnecessary judgment that an Act of Congress is unconstitutional as applied, today's decision adds significant complexity to the administration of § 4371. Under the thumb of the Court's holding that all premiums paid to insure export goods are exempt from § 4371, but also under the statutory mandate to collect the tax in all other instances, the Internal Revenue Service (IRS) henceforth finds itself faced with an array of new problems unexplained and unmentioned by the Court. Insurance is one of the

most complex of businesses, with a multitude of coverage and policy options in different product lines, all generated and still evolving in pursuit of the profitable and efficient underwriting of risks. Not every case will fit the simple model here: a policy written for a single shipment; coverage beginning only with a common carrier picking up the goods from the warehouse or manufacturing plant; simple ascertainment of point of entry into the export stream. Stipulation of Facts ¶¶ 13, 16, App. to Pet. for Cert. 37a, 39a; cf. *A. G. Spalding & Bros.* v. *Edwards,* 262 U. S. 66, 68–69 (1923) (delivery to common carrier signals commencement of export).

Commercial inland marine transit insurance, the form of casualty insurance which covers domestic transportation of goods, "is usually written on an open basis, under which all shipments of the kind of merchandise described in the policy are covered." Holtom, *supra,* at 435. It would appear, from today's decision, that if a company has an open policy from a foreign insurer covering the domestic leg of the journey for all shipments, the IRS must untangle what portion of the insurance covered goods that had commenced the process of exportation, and then prorate the tax. So too would proration (or some other accommodation) appear necessary if the policy is taken out on a single shipment but part of the shipment is delivered within the country and part abroad.

In addition, the Court's decision draws the IRS into the factual morass of determining when exportation has begun. That will often be less clear than it is here. For example, a company may have its own trucks carry goods to a freight forwarder or port, or a hiatus in the journey might be extensive enough to remove the goods from the export stream, see *Joy Oil Co.* v. *State Tax Comm'n,* 337 U. S. 286, 288–289 (1949); since "not every preliminary movement of goods toward eventual exportation" triggers the constitutional immunity, *Kosydar* v. *National Cash Register Co.,* 417 U. S. 62, 69, n. 6 (1974), the determination of the commencement of

exportation is another layer of complexity added to the administration of § 4371. Finally, the IRS now must determine which of the many, ever evolving types of insurance fall within the broad prohibition of *Thames & Mersey* against any tax that burdens the exporting process. See 237 U. S., at 27. Truckers, for example, often take insurance out to cover liability for the loss or damage to merchandise that they are carrying. Holtom, *supra*, at 435. The cost of that insurance, which may be specific to an export shipment and related to the value of the goods, is likely passed through in some measure to the exporter and therefore "falls upon the exporting process," *Thames & Mersey*, 237 U. S., at 27. Questions will also arise whether it violates the Export Clause to tax insurance taken out by an export freight-forwarder to cover a warehouse storing goods in transit, or to tax ocean marine protection and indemnity insurance taken out by a vessel owner to protect against damage to export cargo, cf. Holtom, *supra*, at 452, if part of the risk covered is domestic.

The severity of these administrative burdens will depend in part upon the penetration of the domestic market by foreign insurers in certain lines. We can anticipate increased burdens with the 4% price cut in foreign insurance for exporters that results from today's decision. The Court is wrong to frustrate the will of Congress by giving exporters an undeserved exemption from § 4371 and by adding needless complexity to the administration of the statute, all upon the incorrect, unexamined assumption that the tax is on exported goods.

## II

Turning to the question that I take to be dispositive, I would hold that the Export Clause does not apply to § 4371. The text and history of the Clause, and its interpretation by the Fifth Congress, suggest that taxes on insurance do not fall within its prohibitions. Because § 4371 taxes a service distinct from the actual export of the goods, and does not

function as a proxy for taxing their value, I would uphold its application to International Business Machines Corporation (IBM).

In my view, the Framers understood the Export Clause to prohibit what its text says: any federal tax "laid on Articles exported," U. S. Const., Art. I, § 9, cl. 5, not taxes on services like insurance that may have indirect effect on the cost of exporting. There was a history of nations' imposing onerous taxes on exported goods, even in England until the rise of mercantilist trade policy resulted in the repeal of most export taxes by the end of the 17th century, see W. Kennedy, English Taxation 1640–1799, p. 35 (1913). And specific taxes on exported goods were the only taxes mentioned in the debate at the Constitutional Convention over the Export Clause. For example, Gouverneur Morris of Pennsylvania, opposing the Clause, favored taxing exports as an alternative to direct taxes on individuals.

> "He considered the taxing of exports to be in many cases highly politic. Virginia has found her account in taxing Tobacco. All Countries having peculiar articles tax the exportation of them; as France her wines and brandies. A tax here on lumber, would fall on the W. Indies & punish their restrictions on our trade. The same is true of live-stock and in some degree of flour. In case of a dearth in the West Indies, we may extort what we please. Taxes on exports are a necessary source of revenue. For a long time the people of America will not have money to pay direct taxes. Seize and sell their effects and you push them into Revolts." 2 M. Farrand, Records of the Federal Convention of 1787, p. 307 (rev. ed. 1966).

See also id., at 306 (Mr. Madison: taxes on exported goods, like tobacco, in which Americans were unrivalled would shift the tax burden to foreigners); id., at 360 (Gouverneur Morris: taxes on goods are essential to embargoes, while taxes on

ginseng and ship masts would shift the tax burden abroad, and taxes on skins, beavers, and other raw materials might encourage American manufactures); *id.*, at 361 (Mr. Dickenson *[sic]*: suggesting exemption of certain articles from the Export Clause); *id.*, at 362 (Mr. Fitzimmons: discussing duties imposed on wool by Great Britain). Proponents of the Export Clause also focused on taxes on goods. *Id.*, at 307 (Mr. Mercer: a tax on exported goods encourages the raising of articles not meant for exportation); *id.*, at 360 (Mr. Williamson: discussing taxation of North Carolina tobacco by Virginia); *id.*, at 361 (Mr. Sherman: general prohibition on power to tax exports necessary because "[a]n enumeration of particular articles would be difficult invidious and improper"); *id.*, at 363 (Colonel Mason: discussing Virginia tax on tobacco; Mr. Clymer: discussing middle States' apprehensions of taxes on products like wheat flour and provisions that, unlike tobacco and rice, were sold in competitive markets). Oliver Ellsworth of Connecticut even contended that he opposed export taxes in part because "there are indeed but a few articles that could be taxed at all; as Tobo. rice & indigo, and a tax on these alone would be partial & unjust." *Id.*, at 360.

In interpreting constitutional restrictions on the taxing power, we must recall that the want of this power in the National Government was one of the great weaknesses of the Articles of Confederation. With its expenses outpacing revenues from requisitions from the States, the central Government had emptied its vaults by 1782 and soon defaulted on its substantial debt. R. Paul, Taxation in the United States 4–5 (1954). As the Convention records indicate, depriving the Federal Government of the power to tax even export goods was a contentious issue, given the concern that it would cut off a needed source of revenue as well as disable Congress from using export taxes as an instrument of policy. Madison's last-minute proposal that the Export Clause's total prohibition on taxing exports be replaced with a provision

requiring a two-thirds vote of each House failed by the vote of only one State. 2 Farrand, *supra*, at 363. There is no cause for extending the Export Clause beyond the bargain struck at the Convention and embodied in its text.

There is other compelling historical evidence weighing against *Thames & Mersey*'s view of the Export Clause as a prohibition extending even to taxes on services that have the indirect effect of raising exportation costs. In 1797 the Fifth Congress passed "An Act laying Duties on stamped Vellum, Parchment and Paper." Among its provisions was a stamp duty upon

> "any policy of insurance or instrument in nature thereof, whereby any ships, vessels or goods going from one district to another in the United States, or from the United States to any foreign port or place, shall be insured, to wit, if going from one district to another in the United States, twenty-five cents; if going from the United States to any foreign port or place, when the sum for which insurance is made shall not exceed five hundred dollars, twenty-five cents; and when the sum insured shall exceed five hundred dollars, one dollar . . . ." Act of July 6, 1797, ch. 11, §1, 1 Stat. 527.

The duties survived until the unpopular Federalist tax system, which was felt to bear too heavily upon those least able to pay, was abolished soon after Jefferson took office. See Paul, *supra*, at 6.

We have always been reluctant to say a statute of this early origin offends the Constitution, absent clear inconsistency. See *Knowlton* v. *Moore*, 178 U. S. 41, 56 (1900) (imposition of legacy taxes in the same 1797 statute casts doubt on claim that Congress lacks such power); see *Ludecke* v. *Watkins*, 335 U. S. 160, 171 (1948) ("The [Alien Enemy Act of 1798] is almost as old as the Constitution, and it would savor of doctrinaire audacity now to find the statute offensive to some emanation of the Bill of Rights"). The 1797

statute should dispel any doubt on the issue. Taxes on insurance do not offend the Export Clause. It is not likely, moreover, that the Act was passed to circumvent the Export Clause. The early Congresses were scrupulous in honoring the Export Clause by making specific exemptions for exports in laws imposing general taxes on goods. See, *e. g.*, Act of Mar. 3, 1791, ch. 15, § 51, 1 Stat. 199, 210–211 (tax on distilled spirits); Act of June 5, 1794, ch. 51, § 14, 1 Stat. 384, 387 (tax on snuff and refined sugar). Their refusal to grant exporters similar exemptions from insurance taxes indicates that those taxes were not viewed as equivalent to taxes on goods.

In *Fairbank* v. *United States,* 181 U. S. 283 (1901), the Court struck down an 1898 statute imposing a stamp tax on an export bill of lading despite a similar tax in the 1797 statute. The decision in *Fairbank* was 5–4, with a strong dissent from the first Justice Harlan urging deference to the implicit exposition of the Export Clause by the Fifth Congress. The Court, though, reserved the contemporaneous-exposition rule for "'doubtful cases,'" *id.,* at 311, and had no doubt that the "discriminating and excessive tax" imposed on export bills of lading in the 1898 Act (10 times that imposed on internal bills of lading, *id.,* at 290) was unconstitutional.

There is no need to reconsider *Fairbank,* nor to distinguish it by sole reliance upon the interpretation offered in *Washington Stevedoring,* which observed that the stamp duty at issue in *Fairbank* "effectively taxed the goods because the bills represented the goods," 435 U. S., at 756, n. 21. The tax here, unlike the stamp duty in *Fairbank,* does not discriminate against exports; it taxes a service distinct from the act of exporting; and it has the clear regulatory purpose of eliminating a perceived competitive advantage of foreign insurers. Viewed in this light, the conclusion of the Fifth Congress that the Export Clause did not bar any tax on export insurance should have great weight in assessing the

constitutionality of § 4371, and *Fairbank* is not to the contrary.

Turning once more to *Thames & Mersey*, I note the 1797 statute was neither briefed to the Court there nor discussed in its opinion. The Court, furthermore, did not examine the text or history of the Export Clause, relying instead on the broad theory of the Clause espoused in the companion case, *United States* v. *Hvoslef*, 237 U. S. 1 (1915): namely, that it meant the "process of exporting . . . should not be obstructed or hindered by any burden of taxation," *id.*, at 13 (internal quotation marks and citation omitted). See *Thames & Mersey*, 237 U. S., at 25. (*Hvoslef*'s holding that a nondiscriminatory tax on charter parties was unconstitutional as applied to export shipments, by the way, is also called into question by the 1797 Act, which imposed a similar tax.)

Besides failing to consider the evidence just cited, the *Thames & Mersey* Court relied in part on the theory that insurance is not commerce and so, by implication, the regulatory aspect of the tax could not be justified as an exercise of Congress' Commerce Clause power. See *Thames & Mersey*, *supra*, at 25, citing *Paul* v. *Virginia*, 8 Wall. 168 (1869). As a result, the Court reasoned, an insurance policy was simply a personal contract and a document which, by custom, was a necessary part of every export transaction. 237 U. S., at 25–26. A tax on the premiums of such a policy, which fell upon the exporting process and increased its costs, was thought to be the equivalent to a tax laid on charter parties, bills of lading, or the goods themselves. *Id.*, at 27. We abandoned long ago the notion that insurance is not commerce and so beyond the power of Congress to regulate. See *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, 543–545 (1944). Congress enacted § 4371 to regulate competition within the insurance field, and its authority to do so ought not to be impaired by a strained reading of the Export

Clause or reliance on the outmoded reasoning of *Thames & Mersey*.

We have discarded, in Import-Export Clause cases, the idea afoot in *Hvoslef* and *Thames & Mersey* that a tax on services necessary to the export process is equivalent to a tax on goods. In *Canton R. Co. v. Rogan*, 340 U. S. 511 (1951), the Court upheld a state gross-receipts tax on a steam railroad, even as applied to the railroad's handling of exports and imports from its marine terminal in the port of Baltimore. The tax was "not on the *goods* but on the *handling* of them at the port," we said, and "when the tax is on activities connected with the export or import the range of immunity cannot be so wide." *Id.*, at 514–515. Following *Canton*, the Court in *Washington Stevedoring* decided that taxes on services may be permissible even if levied upon an activity, such as stevedoring, which occurs while imports and exports are in transit. We remarked: "The transportation services in both settings are necessary to the import-export process. Taxation in neither setting relates to the value of the goods, and therefore in neither can it be considered taxation upon the goods themselves." 435 U. S., at 757. The distinctions drawn between services and goods in those cases did not depend on the differences between the text of the Export and Import-Export Clauses, and should be observed here.

The Court's effort to justify its decision on the grounds of *stare decisis*, *ante*, at 856, is unconvincing. *Stare decisis* does not protect a constitutional decision where the reasoning is as poor as it is in *Thames & Mersey*, see *Smith v. Allwright*, 321 U. S. 649, 665 (1944), nor when the precedent, even if not yet proved unworkable, is at odds with more recent cases, see *Fulton Corp. v. Faulkner*, 516 U. S. 325, 345–346 (1996). It is, moreover, just a matter of time before *Thames & Mersey* proves itself unworkable; prior to today, it had not been given the chance to work its mischief on § 4371.

As we move to a more service-intensive and export-oriented economy, and as policymakers and experts debate

the wisdom of shifting from income to excise taxes, see Lugar, The National Sales Tax: Avoiding the Zero-Sum Scenario, 48 Tax Executive 26 (1996); Bartlett, Replacing Federal Taxes with a Sales Tax, 68 Tax Notes 997 (1995), we should not use shaky precedent to deprive Congress of important regulatory and revenue-raising options. As respondent conceded at oral argument, Tr. of Oral Arg. 31, the reasoning of *Thames & Mersey* invites claims by export service providers for exemptions from any number of federal excise taxes, for example, a challenge to the diesel-fuel tax, 26 U. S. C. § 4041, by truckers carrying export shipments. The Export Clause cannot bear this reading.

The protections of the Export Clause must extend, perhaps, somewhat beyond specific taxes on goods, for "[i]f it meant no more than that, the obstructions to exportation which it was the purpose to prevent could readily be set up by legislation nominally conforming to the constitutional restriction but in effect overriding it." *Hvoslef, supra,* at 13. As a result, the Court has found certain taxes to be proxies for taxes on the goods. See *Washington Stevedoring, supra,* at 756, n. 21 (discussing sales tax struck down in *Richfield Oil Corp.* v. *State Bd. of Equalization,* 329 U. S. 69 (1946), and the tax on a bill of lading struck down in *Fairbank* v. *United States,* 181 U. S. 283 (1901)). In *Washington Stevedoring,* we expressed some doubt that the tax on insurance in *Thames & Mersey* fell in this forbidden category, but, to avoid overruling the case, "note[d] that the value of goods bears a much closer relation to the value of insurance policies on them than to the value of loading and unloading ships." 435 U. S., at 756, n. 21.

The insurance premiums taxed here, like those taxed in *Thames & Mersey,* bear some relation to the value of the goods, but this does not make them a proxy for a tax on the goods. Premiums, *i. e.,* the price of insurance, depend on risk of loss, and value of the goods is only one component factor of risk. So much is made clear by Stipulation 16 in

this case. Before the premiums for a shipment of IBM goods of a certain value could be fixed, a premium rate had to be determined. The rate was a function of the risk factors specific to a particular shipment: "the place of origin and destination of the goods, the type of goods involved and how they were packaged, the time and distance of the trip, the route and mode(s) of transportation, and the amount of material handling expected during the trip." Premiums were then determined by multiplying the value of the goods by the shipment-specific premium rate. Stipulation of Facts ¶ 16, App. to Pet. for Cert. 39a. Cf. Holtom, Underwriting Principles & Practices, at 453–457 (discussing various factors taken into account in underwriting ocean marine insurance, such as nationality of the crew, vessel management, seaworthiness of the vessel, suitability of the vessel for specific cargo, packaging, season of travel, perishability, pilferage risks at ports of call, and risks of damage from accompanying cargo). The premium charged to insure a million dollars of goods for the short overland journey from IBM's computer factory in Richfield, Minnesota, to a customer in Quebec would be trifling in comparison to the premium charged to insure transport of goods of equivalent value from its factory in San Jose, California, across the continent east to New York and then by sea to Russia. Cf. Stipulation of Facts, App. to Pet. for Cert. 36a–37a; Brief for Respondent 3, n. 2. Given the stipulated, undeniable premise that premiums are graded by risk of loss, they are not a predictable proxy for a Congress intent upon taxing export value. Premiums are a rough proxy, however, for the income of foreign insurers, which is why a Congress intent on eliminating the income tax advantages of those insurers would structure § 4371 as it did.

Section 4371's requirement that the insurance cover domestic risks in whole or in part is further evidence that Congress did not intend it to operate as a proxy for taxing exports. A statute that exempts all exporters who use a

domestic insurer for the inland leg of a shipment is not an effective instrument for taxing export goods.

I would uphold § 4371 as applied to IBM because the statute imposes a tax on a distinct export-related service and is not a proxy for a tax on the exports themselves. The Court, in my view, makes a serious mistake in assuming the opposite and reaching the question whether a nondiscriminatory tax on goods violates the Export Clause. I would reverse the judgment of the Court of Appeals for the Federal Circuit.

## LOCKHEED CORP. ET AL. *v.* SPINK

No. 95–809.   Argued April 22, 1996—Decided June 10, 1996

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SCALIA, KENNEDY, and GINSBURG, JJ., joined, and in which SOUTER and BREYER, JJ., joined as to all but Part III–B. BREYER, J., filed an opinion concurring in part and dissenting in part, in which SOUTER, J., joined, *post*, p. 898.

*Gordon E. Kirscher* argued the cause for petitioners. With him on the briefs were *David E. Gordon, Kenneth E. Johnson, Kenneth S. Geller,* and *Ralph A. Hurvitz.*

*Richard P. Bress* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, Assistant Attorney General Argrett, Edwin S. Kneedler, Kenneth L. Greene, J. Davitt McAteer, Allen H. Feldman,* and *Edward D. Sieger.*

*Theresa M. Traber* argued the cause for respondent. With her on the brief was *Bert Voorhees.\**

JUSTICE THOMAS delivered the opinion of the Court.

In this case, we decide whether the payment of benefits pursuant to an early retirement program conditioned on the participants' release of employment-related claims constitutes a prohibited transaction under the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U. S. C. § 1001 *et seq.* We also determine whether the 1986 amendments to ERISA and the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 602, as amended, 29 U. S. C. § 621 *et seq.,* forbidding age-based discrimination in pension plans apply retroactively.

I

Respondent Paul Spink was employed by petitioner Lockheed Corporation from 1939 until 1950, when he left to work

---

*Briefs of *amici curiae* urging reversal were filed for the ERISA Industry Committee by *Michael E. Horne* and *John M. Vine;* for the Equal Employment Advisory Council by *Douglas S. McDowell* and *Ellen Duffy McKay;* and for the New England Legal Foundation by *William J. Kilberg, Peter H. Turza, Paul Blankenstein, Mark Snyderman,* and *Stephen S. Ostrach.*

Briefs of *amici curiae* urging affirmance were filed for the American Association of Retired Persons by *Cathy Ventrell-Monsees* and *Mary Ellen Signorille;* for the Engineers and Scientists Guild, Lockheed Section, by *Stuart Libicki;* and for the National Employment Lawyers Association by *Stephen R. Bruce, Ronald Dean,* and *Jeffrey Lewis.*

Briefs of *amici curiae* were filed for the American Academy of Actuaries et al. by *Lauren M. Bloom;* and for the Chamber of Commerce of the United States by *Hollis T. Hurd, Stephen A. Bokat,* and *Robin S. Conrad.*

for one of Lockheed's competitors. In 1979, Lockheed persuaded Spink to return. Spink was 61 years old when he resumed employment with Lockheed. At that time, the terms of the Lockheed Retirement Plan for Certain Salaried Individuals (Plan), a defined benefit plan, excluded from participation employees who were over the age of 60 when hired. This was expressly permitted by ERISA. See 29 U. S. C. § 1052(a)(2)(B) (1982 ed.).

Congress subsequently passed the Omnibus Budget Reconciliation Act of 1986 (OBRA), Pub. L. 99–509, 100 Stat. 1874. Section 9203(a)(1) of OBRA, 100 Stat. 1979, repealed the age-based exclusion provision of ERISA, and the statute now flatly mandates that "[n]o pension plan may exclude from participation (on the basis of age) employees who have attained a specified age." 29 U. S. C. § 1052(a)(2). Sections 9201 and 9202 of OBRA, 100 Stat. 1973–1978, amended ERISA and the ADEA to prohibit age-based cessations of benefit accruals and age-based reductions in benefit accrual rates. See 29 U. S. C. §§ 1054(b)(1)(H)(i), 623(i)(1).

In an effort to comply with these new laws, Lockheed ceased its prior practice of age-based exclusion from the Plan, effective December 25, 1988. As of that date, all employees, including Spink, who had previously been ineligible to participate in the Plan due to their age at the time of hiring became members of the Plan. Lockheed made clear, however, that it would not credit those employees for years of service rendered before they became members.

When later faced with the need to streamline its operations, Lockheed amended the Plan to provide financial incentives for certain employees to retire early. Lockheed established two programs, both of which offered increased pension benefits to employees who would retire early, payable out of the Plan's surplus assets. Both programs required as a condition of the receipt of benefits that participants release any employment-related claims they might have against Lockheed. Though Spink was eligible for one of the pro-

grams, he declined to participate because he did not wish to waive any ADEA or ERISA claims. He then retired, without earning any extra benefits for doing so.

Spink brought this suit, in his individual capacity and on behalf of others similarly situated, against Lockheed and several of its directors and officers. Among other things, the complaint alleged that Lockheed and the members of the board of directors violated ERISA's duty of care and prohibited transaction provisions, 29 U. S. C. §§ 1104(a), 1106(a), by amending the Plan to create the retirement programs. Relatedly, the complaint alleged that the members of Lockheed's Retirement Committee, who implemented the Plan as amended by the board, violated those same parts of ERISA. The complaint also asserted that the OBRA amendments to ERISA and the ADEA required Lockheed to count Spink's pre-1988 service years toward his accrued pension benefits. For these alleged ERISA violations, Spink sought monetary, declaratory, and injunctive relief pursuant to §§ 502(a)(2) and (3) of ERISA's civil enforcement provisions, 29 U. S. C. §§ 1132(a)(2), (3). Lockheed moved to dismiss the complaint for failure to state a claim, and the District Court granted the motion.

The Court of Appeals for the Ninth Circuit reversed in relevant part. 60 F. 3d 616 (1995). The Court of Appeals held that the amendments to the Plan were unlawful under ERISA § 406(a)(1)(D), 29 U. S. C. § 1106(a)(1)(D), which prohibits a fiduciary from causing a plan to engage in a transaction that transfers plan assets to a party in interest or involves the use of plan assets for the benefit of a party in interest. The court reasoned that because the amendments offered increased benefits in exchange for a release of employment claims, they constituted a use of Plan assets to "purchase" a significant benefit for Lockheed. 60 F. 3d, at 624. Though the court found a violation of § 406(a)(1)(D), it decided that there was no need to address Lockheed's status as a fiduciary. *Id.*, at 623, n. 5. In addition, the Court of

Appeals agreed with Spink that Lockheed had violated the OBRA amendments by refusing to include Spink's service years prior to 1988 in determining his benefits. In so holding, the court found that the OBRA amendments apply retroactively. See *id.*, at 620, n. 1. We issued a writ of certiorari, 516 U. S. 1087 (1996), and now reverse.

## II

Nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan. *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 91 (1983); *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U. S. 504, 511 (1981). ERISA does, however, seek to ensure that employees will not be left emptyhanded once employers have guaranteed them certain benefits. As we said in *Nachman Corp.* v. *Pension Benefit Guaranty Corporation*, 446 U. S. 359 (1980), when Congress enacted ERISA it "wanted to . . . mak[e] sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit— he actually will receive it." *Id.*, at 375. Accordingly, ERISA tries to "make as certain as possible that pension fund assets [will] be adequate" to meet expected benefits payments. *Ibid.*

To increase the chances that employers will be able to honor their benefits commitments—that is, to guard against the possibility of bankrupt pension funds—Congress incorporated several key measures into ERISA. Section 302 of ERISA sets minimum annual funding levels for all covered plans, see 29 U. S. C. §§ 1082(a), 1082(b), and creates tax liens in favor of such plans when those funding levels are not met, see § 1082(f). Sections 404 and 409 of ERISA impose respectively a duty of care with respect to the management of existing trust funds, along with liability for breach of that duty, upon plan fiduciaries. See §§ 1104(a), 1109(a). Fi-

nally, § 406 of ERISA prohibits fiduciaries from involving the plan and its assets in certain kinds of business deals. See § 1106. It is this last feature of ERISA that is at issue today.

Congress enacted § 406 "to bar categorically a transaction that [is] likely to injure the pension plan." *Commissioner* v. *Keystone Consol. Industries, Inc.,* 508 U. S. 152, 160 (1993). That section mandates, in relevant part, that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U. S. C. § 1106(a)(1)(D).[1] The question here is whether this provision of ERISA prevents an employer from conditioning the receipt of early retirement benefits upon the participants' waiver of employment claims. For the following reasons, we hold that it does not.

## III

Section 406(a)(1) regulates the conduct of plan fiduciaries, placing certain transactions outside the scope of their lawful authority. When a fiduciary violates the rules set forth in § 406(a)(1), § 409 of ERISA renders him personally liable for any losses incurred by the plan, any ill-gotten profits, and other equitable and remedial relief deemed appropriate by the court. See 29 U. S. C. § 1109(a). But in order to sustain an alleged transgression of § 406(a), a plaintiff must show that a fiduciary caused the plan to engage in the allegedly unlawful transaction.[2] Unless a plaintiff can make that

---

[1] Section 408 enumerates specific exceptions to the prohibitions in § 406. See 29 U. S. C. § 1108(b). Lockheed does not argue that any of these exceptions pertain to this case.

showing, there can be no violation of §406(a)(1) to warrant relief under the enforcement provisions. Cf. *Peacock* v. *Thomas*, 516 U. S. 349, 353 (1996) ("Section 502(a)(3) 'does not, after all, authorize "appropriate equitable relief" *at large*, but only "appropriate equitable relief" for the purpose of "redress[ing any] violations or . . . enforc[ing] any provisions" of ERISA'") (quoting *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 253 (1993)). The Court of Appeals erred by not asking whether fiduciary status existed in this case before it found a violation of §406(a)(1)(D).[3]

## A

We first address the allegation in Spink's complaint that Lockheed and the board of directors breached their fiduciary

indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U. S. C. §1002(21)(A).